# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | |
|---|---|
| HIEP DO AND JULIE DO, §<br>§<br>PLAINTIFFS, §<br>§<br>V. §<br>§<br>PILGRIM'S PRIDE CORPORATION, §<br>FARMERS STATE BANK, WILLIAM §<br>BRIMHALL D.B.A. BRIMHALL §<br>APPRAISAL SERVICES, PROFESSIONAL §<br>TITLE SERVICES, INC., ALEXANDER §<br>HUNGNGOC NGUYENLIEN, LOUIS §<br>TRUONG A.K.A. LUAN TRUONG, §<br>TRUONG TRUONG, ADAM TRUONG, §<br>ALAN TRUONG, OTHER UNNAMED §<br>TRUONG FAMILY MEMBERS, AND §<br>OTHER UNNAMED DEFENDANTS, §<br>§<br>DEFENDANTS. § | CIVIL ACTION NO. 9:05 CV 238<br>JURY DEMANDED |

## PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

COME NOW Plaintiffs Hiep Do and Julie Do and file this their First Amended Original Complaint, complaining of the actions of Pilgrim's Pride Corporation, Farmers State Bank, William C. Brimhall d.b.a. Brimhall Appraisal Services, Professional Title Services, Inc., Alexander Hungngoc Nguyenlien, Louis Truong a.k.a. Luan Truong, Truong Truong, Adam Truong, Alan Truong, other unnamed Truong Family Members (collectively "the Truongs"), and other Unnamed

Defendants.  As good and sufficient grounds for said Amended Complaint, Plaintiffs would respectfully show this Honorable Court the following:

## I. <u>Parties</u>

1.      Plaintiffs Hiep Do and Julie Do (collectively 'Plaintiffs') are individual persons who reside in Nacogdoches, Nacogdoches County, Texas.  Plaintiff Hiep Do entered into a series of contracts with Defendant Pilgrim's Pride in Nacogdoches County, Texas between September 2004 and January 2005 for the production of poultry in Texas.  Further, in connection with said contracts, a bank loan was procured to finance a chicken farm on which the poultry were to be raised and where Plaintiffs were required to live according to the contracts.  Plaintiff Julie Do is Plaintiff Hiep Do's spouse and is named because she is the co-signor for the bank loan on the farm and because her signature appears on many of the below described loan and title documents that are connected with the described transaction.  As such, she has been misled and defrauded to the extent that she was required to be a co-signor for the loans associated with the purchase of the farm and her husband entering into the contracts with Pilgrim's Pride.  Although jointly named as Plaintiffs and although both of these individuals are globally referred to as 'Plaintiffs,' a significant portion of the actions described below are in reference to the activities of Plaintiff Hiep Do and his interaction with the named and unnamed Defendants.

2.      Defendant Pilgrim's Pride Corporation (hereinafter "Pilgrim's Pride") is a foreign corporation, partnership, sole proprietorship, or other form of business association doing business in Texas.   Additionally, Pilgrim's Pride has it principal place of business in Texas.  The Court has personal jurisdiction over Pilgrim's Pride because all of the transactions involving Pilgrim's Pride that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication and commerce to and from Texas.  Plaintiffs are sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the Amended Complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request. Otherwise, service on Pilgrim's Pride can be made on its registered agent CT Corporation System, 350 N. St. Paul St., Dallas, Texas 75201.

3.      Defendant Farmers State Bank (hereinafter "Farmers State Bank" or "the Bank") is a Texas State Financial Institution, corporation, partnership, sole proprietorship, or other form of business association doing business in Texas. Farmers State Bank's principal place of business is Texas.  The Court has personal jurisdiction over Farmers State Bank, because all of the transactions involving Farmers State Bank that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication and commerce to and from Texas.  Plaintiffs are sending by first class mail or other reliable means

including hand delivery or certified mail RRR, a copy of the Amended Complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request.   Otherwise, this Defendant may be served by serving its registered agent Thomas R. McLeroy, 103 West Austin St. Center, Texas 75935.

4.     Upon information and belief, Defendant Alexander Hungngoc Nguyenlien is a resident of either Texas, Louisiana, or California.   Alexander Hungngoc Nguyenlien, at least in name, entered into several contracts with Defendant Pilgrim's Pride in Texas.   The Court has personal jurisdiction over Alexander Hungngoc Nguyenlien because all of the transactions involving Alexander Hungngoc Nguyenlien that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication and commerce to and from Texas.   Plaintiffs are sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the Amended Complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request.   Otherwise, service on Alexander Hungngoc Nguyenlien can be made at 3300 CR 48 #A, Rosharon, Texas 77583 to him personally or to his agent Mr. Truong Truong at the same address.

5.     Defendant Truong Truong is sued individually and as an agent of Alexander Hungngoc Nguyenlien.   Truong Truong is a citizen of the State of Texas,

operating as an employee and agent of Alexander Hungngoc Nguyenlien, who is a citizen of Texas, Louisiana or California.  The Court has personal jurisdiction over Truong Truong because all of the transactions involving Truong Truong that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication and commerce to and from Texas.  Plaintiffs are sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the Amended Complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request.  Otherwise, service on Truong Truong can be made at 3300 CR 48 #A, Rosharon, Texas 77583.

6.      Defendant Louis Truong a.k.a. Luan Truong is sued in his individual capacity and/or as partner with or in the alternative as employee of Alexander Hungngoc Nguyenlien.  Louis Truong a.k.a. Luan Truong is a citizen of Texas.  This Defendant has many different names that he goes by.  Upon information and belief, this Defendant has been known to go by Luan, Lou, Lewis, Louis and Luis.  In addition, according to this Defendant he is the father of Alexander Hungngoc Nguyenlien, Troung Troung, Alan Troung and Adam Troung.  The Court has personal jurisdiction over Louis Truong a.k.a. Luan Truong because all of the transactions involving Louis Truong a.k.a. Luan Truong that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate

communication and commerce to and from Texas.  Plaintiffs are sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the Amended Complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request. Otherwise, service on Louis Truong a.k.a. Luan Truong can be made at 3300 CR 48 #A, Rosharon, Texas 77583.

7.     Defendant Alan Truong is sued in his individual capacity and as partner with or in the alternative employee of Alexander Hungngoc Nguyenlien.  Alan Truong is a citizens of Texas. The Court has personal jurisdiction over Alan Truong because all of the transactions involving Alan Truong that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication and commerce to and from Texas.  Plaintiffs are sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the Amended Complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request. Otherwise, service on Alan Truong can be made at 3300 CR 48 #A, Rosharon, Texas 77583.

8.     Defendant Adam Truong is sued in his individual capacity and as partner with or in the alternative employee of Alexander Hungngoc Nguyenlien.  Adam Truong is a citizens of Texas. The Court has personal jurisdiction over Adam Truong

because all of the transactions involving Adam Truong that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication and commerce to and from Texas.  Plaintiffs are sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the Amended Complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request. Otherwise, service on Adam Truong can be made at 3300 CR 48 #A, Rosharon, Texas 77583.

9.     Defendants Other Unnamed Truong Family Members (other unidentified individual members of the Truong family, herein after referred to as "the Truongs") are sued in their individual capacity and as partners with or in the alternative employees of Alexander Hungngoc Nguyenlien or in the alternative as employees for Defendant Pilgrim's Pride.  Plaintiffs have made a diligent attempt to identify these persons individually by interviewing members of the Truong family.  However, it would appear that either for the purpose of concealing their fraudulent behavior or for some other unknown nefarious purpose, the Truongs appear to be actively concealing the name and/or identity of the names and members of their family.  Plaintiffs believe that adequate discovery may cure this lack of identity to the extent that it exists. The Truongs, on information and belief, are citizens of Texas. The Court has personal jurisdiction over the Truongs because all of the transactions involving the Truongs

that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication and commerce to and from Texas. Plaintiffs reserve their right to seek leave of the Court to amend their Amended Complaint to properly named and serve these Unnamed Troung family members once they have been properly identified.

10.     William C. Brimhall d.b.a. Brimhall Appraisal Services (hereinafter "Brimhall Appraisal Services," "Brimhall" or "William Brimhall") is sued in his individual capacity and as owner/president of Brimhall Appraisal Services.  William Brimhall is a citizen of Texas and Brimhall Appraisal Services is a corporation, partnership, sole proprietorship, or other form of business association doing business in Texas.  Brimhall Appraisal Services has its principle place of business in Lufkin, Texas.  The Court has personal jurisdiction over William Brimhall d.b.a. Brimhall Appraisal Services because all of the transactions involving William Brimhall d.b.a. Brimhall Appraisal Services that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication and commerce to and from Texas.  Plaintiffs are sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the Amended Complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request.  Otherwise,

service on William Brimhall d.b.a. Brimhall Appraisal Services can be made at 162 Lancewood Circle, Lufkin, Texas 75904-9418.

11.    Professional Title Services, Inc. (hereinafter "Professional Title Services" or "the Title company") is a corporation, partnership, sole proprietorship, or other form of business association doing business in Texas.   Professional Title Services has its principal place of business in Texas.   The Court has personal jurisdiction over Professional Title Services, Inc. because all of the transactions involving Professional Title Services, Inc. that serve as the basis of this suit, either occurred in Texas or involve business in Texas, and involve interstate communication and commerce to and from Texas.   Plaintiffs are sending by first class mail or other reliable means including hand delivery or certified mail RRR, a copy of the Amended Complaint along with the required notice pursuant to Rule 84 informing this Defendant of the consequences of a failure to comply with this request.   Otherwise, service on Professional Title Services, Inc. can be made on its registered agent J. Ken Muckelroy at 616 Tenaha, Ste. A, Center, Texas 75935.

12.    Other Unnamed Defendants that have yet to be discovered.   In the Amended Complaint below, when Defendants are referred to globally, these Unnamed Defendants are included to the extent these person took part in a particular transaction.   Plaintiffs reserve their right to seek leave of the Court to amend their

Complaint to properly name and serve these other Unnamed Defendants once they have been properly identified.

## II. Index

I.  Parties_____2
II.  Index_____10
III.  Jurisdiction_____11
IV.  Personal Jurisdiction and Venue_____11
V.  Introduction_____12
VI.  Facts_____20
    A.  General Facts_____20
    B.  Defendants' Individual Conduct_____28
        i.  The Truongs_____28
        ii.  Farmers State Bank_____32
        iii.  William Brimhall d.b.a. Brimhall Appraisal Services_40
        iv.  Pilgrim's Pride and Professional Title Services_____41
            Economic Extortion_____46
            Biosecurity or "Bio-ruse?"_____49
            "Which came first, the chicken or the greed?"_____53
            Brazen Behavior_____58
VII. Causes of Action_____59
    A.  RICO_____59
        1.  General Allegations_____59
        2.  Pattern of Unlawful Racketeering Activity_____64
        3.  Enterprise and Scheme_____67
        4.  Violation of 18 U.S.C. § 1962(c)_____73
        5.  Violation of 18 U.S.C. § 1962(d)_____74
        6.  Defendants' Actions Affect Interstate Commerce_____75
    B.  Fraud, Constructive Fraud, and Fraud in the Inducement____76
    C.  Breach of Contract_____83
    D.  Economic Duress_____88
    E.  Unjust Enrichment_____90
    F.  Constructive Trust_____92
    G.  Breach of Fiduciary Duty_____93
    H.  Breach of the Duty of Good Faith and Fair Dealing_____94

    I.  Conversion_____95
    J.  Tortious Interference with Contract_____96
    K.  Waiver_____97
VIII.  Good Faith_____99
IX.  Suit for an Accounting_____100
PRAYER_____101

### III.  Jurisdiction

13.    This Court has jurisdiction under Title 18 U.S.C. §§ 1341, 1343, 1951, 1952, 1961 and 1962 (the Racketeer Influenced and Corrupt Organizations Act "RICO").    Additionally, this Court has pendent jurisdiction over the state claims based upon Texas state laws, pursuant to 28 U.S.C. § 1367(a).    All claims under federal and state law in this Amended Complaint are based upon a common nucleus of facts and series of events such that the entire action commenced by this litigation constitutes a single case that would ordinarily be tried in one judicial proceeding. Pendent jurisdiction would avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience and fairness.

### IV.  Personal Jurisdiction and Venue

14.    Personal jurisdiction and venue are predicated upon 18 U.S.C. § 1965(a) and (b) and 28 U.S.C. § 1391(b) since the Defendants[1] are residents of, have an agent

---

[1] Upon information and belief, all of the named parties are citizens of Texas, with the exception of Alexander Hungngoc Nguyenlien (who appears to reside in either Texas, Louisiana and California) and Pilgrim's Pride who is foreign corporation doing business in Texas.  Upon information and

or agents, or transact their affairs in the Eastern District of Texas.  Additionally, the acts and occurrences in furtherance of the claims alleged herein arose in the Eastern District of Texas.  *See also paragraphs 1 - 12 supra.*  The ends of justice require that other parties residing in other districts be brought before the Court.

## V. <u>Introduction</u>

15.    On a micro level, this Amended Complaint concerns the Plaintiffs' injuries and damages resulting from the Defendants' conduct, which is related to the purchase and financing of a farm in Texas and for a series of poultry contracts on that farm.   On a macro level, this Amended Complaint concerns the fraudulent and criminal manner that certain poultry companies, financial institutions, other persons or entities, conduct business in the poultry industry in the United States.  As such, this Amended Complaint is brought to address the Defendants' conspiracy to commit fraud under the Racketeer Influenced and Corrupt Organizations Act ("RICO") Title 18 U.S.C. §§ 1341, 1343, 1951, 1961, and 1962.  Additionally this suit is brought under Texas law for fraud, constructive fraud, fraud in the inducement, breach of contract, and economic duress.  Additionally, and/or in the alternative, Defendants are sued for unjust enrichment and constructive trust.  Further, Defendants violated a special fiduciary relationship to Plaintiffs, as well as their duty of good faith and fair

---

belief, all of the fraudulent and criminal acts that Defendant Nguyenlien is responsible for were accomplished by his agent, save for his active concealment of his true identity.  Furthermore, upon information and belief, Mr. Nguyenlien may have been a straw purchaser, used for the purpose of facilitating the previous purchase of the farm on behalf of the Truongs.

dealing.   Additionally, Plaintiffs bring action for common law conversion regarding Plaintiffs' equipment and supplies that were unlawfully take from the farm.   Plaintiffs also sue for an accounting regarding Farmers State Bank and the Truongs regarding the appraisal and sale of the farm and for Pilgrim's Pride's activities before, during and after the so-called 'take-over.'

16.     As it regards Farmers State Bank, the Bank tortiously interfered with the contracts between Plaintiffs and Pilgrim's Pride.   Additionally, to the extent that Pilgrim's Pride claims that they were justified in its decision to cancel contracts, Pilgrim's Pride's actions were pretextual and/or additionally Pilgrim's Pride is estopped from claiming a breach of contract by the doctrine of waiver.   This suit involves a integrate web of persons and entities including the chicken company, the financing Bank, the seller, the sellers agent, the title company, the appraiser, the seller's relatives, numerous company officials employed at Pilgrim's Pride, including a distant owner of the farm in question.

17.     The farm in question, Timberlake Farm (hereinafter referred to as "Timberlake Farm" or "the farm"), is located in Timpson, Shelby County, Texas and was part of an integrated chicken production industry that is already infamous for abusing its contract farmers.[2]   As described below, the predominant nature of the

---

[2] *See* Edward P. Lord, Comment, <u>Fairness for Modern Farmers: Reconsidering the Need for Legislation Governing Production Contracts</u>, 33 WAKE FOREST L. REV. 1125-1156 (1998). "The costs of poultry farming are not limited to buying the poultry houses. Farmers must often make

chicken industry in the United States is one of "integration."  By integration, it is meant that the chicken company, in this case Pilgrim's Pride, owns virtually every aspect of its market share of the industry except (for the most part) the physical farm where the chickens are raised.  Further, the contracts used in these operations are "contracts of adhesion."  That is to say, there simply is no negotiation in association with the production of these contracts.[3]  Additionally, in the instant context, there existed enormous differences in bargaining power between Pilgrim's Pride and the Plaintiffs.

---

improvements and add new equipment to those houses upon demand by the integrator.  One production contract called for farmers to maintain housing that conformed to the written standards of the integrator and "to adopt new management practices and install new or additional equipment required by [the integrator]."  **This open-ended requirement places a potentially heavy burden on the farmer.  It also creates an opportunity for abuse by the integrator. Some farmers complain that integrators use these "update and repair" provisions to fund research and development activities.  Farmers make the capital investments necessary for the experimental equipment, while integrators risk only the flocks, feed, and medicine**" (citing to Randi Ilyse Roth, Contract Farming Breeds Big Problems for Growers, Farmers' Legal Action Rep., Winter 1992, at 12, 14 n.9. *See also Continental Grain Co. v. Beasley,* 628 So. 2d. 319, 321 (Ala. 1993). In *Beasley,* plaintiffs alleged that the processor required them to install tunnel ventilation after initially representing that tunnel ventilation would not be required. *Id. at 322.* When the growers refused to install tunnel ventilation, the processor terminated their contracts. See *id. at 321.*

[3] *See again* Edward P. Lord, Comment, <u>Fairness for Modern Farmers: Reconsidering the Need for Legislation Governing Production Contracts</u>, 33 WAKE FOREST L. REV. 1125-1156 (1998). "An individual farmer who enters a production contract with an integrator is in a weak bargaining position.   Integrators draft most production contracts and offer them to farmers without any opportunity for effective negotiation.  One clear reason for the farmers' weak position is the necessity of having a contract. If the integrator will not put chickens in the houses, the farmer may lose the farm."  As a Florida farmer said, "Only when we as growers are able to sit down and negotiate these contracts, will we be a true partner in this business that we have so much invested - our lives, our homes, and at least one-half of the capital investment in the poultry industry."  (citing to Michelle M. Jones, Chick Quality Can Adversely Affect Grower's Bottom Line, Poultry Grower News, Nov.-Dec. 1994, at 6, 7 (quoting Arthur Gaskins, President of the National Contract Poultry Growers Association). **Mr. Gaskins' estimate that poultry farmers have invested more than one-half of the capital in the poultry industry is supported by the findings of a bill recently introduced in the United States House of Representatives**. See H.R. 2738, 105th Cong. 2(4) (1997).

18.    Pilgrim's Pride is a multi-billion dollar company and controls a large portion of the chicken industry in the United States and abroad. This control, at least within Pilgrim's market share, is a virtual monopoly over the industry, in spite of the ownership arrangement with these farms.   Indeed, Pilgrim's Pride's indentured servitude-like tactics are apparently a recipe for financial success.   Pilgrim's Pride operates as the second-largest chicken producer in the United States, the largest chicken company in Puerto Rico and the second-largest chicken company in Mexico. Pilgrim's Pride currently processes approximately 30 million birds per week for a total of more than six *billion* pounds of poultry per year.   Pilgrim's Pride ranked number 364 in the 2005 Fortune 500.  In 2004, its sales reached $5.3 Billion.

19.    Pilgrim's Prides success is not surprising. This organization impresses others into service thorough the use of extortionate business practices, and requires others to carry the burden of the capital investment and improvement of the farms responsible for producing its product.  Further, this business model constitutes an 'off-balance sheet' accounting scam.  Instead of the party better capable of taking on the capital investment risk of property, plant and equipment (PP&E), Pilgrim's Pride shifts this responsibility to the farmer running the operations of the chicken farm. Upon information and belief, in such a capitally intensive industry, if Pilgrim's Pride owned and financed all of the chicken farms in its integrated business system, it would constitute a materially significant portion of Pilgrim's Pride's assets and

liabilities.   In reality, these farmers are not only financially strapped with the tyrannical capital improvement schedule of the farm, but are also required to carry the burden of the enormous liability associated with purchasing and financing the PP&E necessary to manage the farm and producing Pilgrim's Pride's product.

20.   Accordingly, at least part of Pilgrim's Pride's success is based on the nearly complete control that it has over its costs within in this "vertical integration." These costs are controlled by, among other things, exercising what has to be described as the abusive control of its contract farm producers. A constant in this system is the need fraudulently lure prospective farmers as business partners into investing, then coercing them into increasing levels of investment and expenditure by threats of removal of the contracts that serve as the vehicle for servicing the farmer-investor's debt.   Further, not only are these abusive tactics pervasive within Pilgrim's Pride's line of integration, support industries outside the line of integration are utilized as well to perpetuate a steady stream of prospective farmers and revenue for the capital improvement of "its farms." As described below, once a contract is entered into, Pilgrim's Pride uses these agreements as a tool for extortion and threat. This web of fraud and intrigue, as propounded herein, includes the chicken company, land sellers, financial institutions, appraisal entities, title entities, and others.

21.   The benefits derived by Pilgrim's Pride in this scheme are numerous. Because they do not 'own' the land and because the exert near slave-like control over

their contract farmers, it avoids nearly all of the cost associated with PP&E acquisition, capital improvement[4], and much of the cost associated with research and development regarding new farm implements.[5]  Not only does this help insure profits, it also is vehicle for making Pilgrim's Pride appear to have a strong debt to income, asset to liability, debt to equity, and other financial ratio calculations performed by financial market analyst and financial reporting agencies.  This is in turn shores up the Pilgrim's Pride's stock price, leading to further market growth.

22.    The actions described herein have a large-scale effect on Pilgrim's Pride market capitalization and, on a different scale, these activities also have a dramatic effect on the farmer.  Pilgrim's Pride exerts control over the individual farmer by (1) threats and extortion regarding the contacts maintained by Pilgrim's Pride and (2) by engaging *other* entities as a "cottage industry" for attracting would be farmers to invest in and capitally improve what is in essence "Pilgrim's Pride's farm."  The farms are located in rural areas, such as East Texas. These areas often have limited industrial bases of their own.  Taking advantage of this, Pilgrim's Pride engages the services a number of entities that are associated with the transfer of land.  This includes the land sellers, financial institutions, appraisal entities, title entities, and others.  The farm sale process follows a repetitive scheme, which is described below.

---

[4] *See* Fairness for Modern Farmers again at page 1131, See also Randi Ilyse Roth, <u>Contract Farming Breeds Big Problems for Growers,</u> Farmers' Legal Action Rep., Winter 1992, at 12, 14 n.9.
[5] See also, Dave Mann, "Getting Plucked:  Texas chicken farmers become modern-day sharecroppers," The Texas Observer, March 18, 2005, at page 6.

23.    The purpose of the fraudulent scheme is simple:   Find an unwary potential farmer to improve "*Pilgrim's Pride's*" farm.   The farm price is arbitrarily inflated before sale, in spite of the fact that the farm will "require" repair and improvement.   This inflation in price serves a two-fold purpose.   It fraudulently implies the profitability of the farm, as well as garnering large sums of money in terms of down payment.   Additionally, it ensures that any loan will be so large that the pressure of debt service virtually guarantees the farmer's compliance to the tyrannical whims of the chicken company.   The farmer is required to simultaneously run, repair and capitally improve the farm, while also simultaneously dealing with the constant barrage of day-to-day maintenance items impressed by the chicken company.   Once something is repaired or improved, another thing is complained of until all of the farmer's resources are expended to "fix" the farm and then leads to a "justification" for canceling the contract with the farmer.

24.    The farm is treated by Pilgrim's Pride as if it is Pilgrim's Pride's farm; and when the Pilgrim's Pride has squeezed what it believes is the last bit of effort and capital investment out of the farmer, the contract is canceled *and* the "farmer-investor" is discarded.   Amazingly, as fully described below, the instant Defendant chicken company, Pilgrim's Pride, had that temerity to memorialize its discussion regarding how the Plaintiffs' farm would be "divided" up (after Plaintiffs were "removed" from the farm) and how the farm would be capitally improved by a new

set of farmers, even *before* the farm was foreclosed upon.  Simply stated, Pilgrim's Pride regards the Plaintiffs' farm as being *its* property; farmers are merely cash and labor conduits.

25.     As demonstrated below, the farmer is responsible for securing payment of the mortgage on the farm. As such, this arrangement is utilized by Pilgrim's Pride as a tool of extortion.  Once Pilgrim's Pride decides that either it has gotten as much out of an investor as possible, or simply changes its business plan, Pilgrim's Pride then operates under the presumption that the farm will be foreclosed and either resold to one or more new owners who will go through the same process.  A series of "maintenance inspections" are conducted in a trumped-up manner and are used a pretextual justification to cancel the contract.  Once this is accomplished, as detailed more fully below, the group of conspirators then meet and decide how to best eject the current farmer and 'defraud' a new farmer or set of farmers.

26.     Evidence already produced *by the instant Defendants* proves that almost every single person involved in this transaction is interrelated and that every one of them stood to profit by the sale of the farm in question in this case.  Every single person stood to gain something financial from the total transaction or series of transactions, all at the cost of the Plaintiffs.  All of the actors in this drama cooperated and conspired towards the same goal, defrauding the Plaintiffs.

# VI. Facts

## A. General Facts

27.     Prior to entering into the poultry contracts in Texas with Pilgrim's Pride and purchasing Timberlake Farm, Plaintiffs and their children were residents of Houston, Harris County, Texas.  In addition, Plaintiff Hiep Do was the owner of an unrelated chicken farm in Georgia, which was managed by Mr. Do's brother.  Plaintiff Hiep Do was primarily responsible for the business aspect of the Georgia farm because his background experience is in business and accounting.[6]  Based on Plaintiffs' positive experiences in Georgia, Plaintiffs became convinced that another farm purchase might prove to be a good investment.  In the early summer of 2004, Plaintiffs became aware that Timberlake Farm was for sale in Texas via a Vietnamese newspaper advertisement.

---

[6] Apparently unbeknownst to Pilgrim's Pride, Hiep Do is more that just some uneducated 'bumpkin' that they were able to take advantage of.  Hiep Do has a wide variety of experiences and a Master of Business Administration degree.  Defendant Pilgrim's Pride has stated from time to time that it did not ever know about the Georgia Farm owned by Plaintiff Hiep Do.  This lack of knowledge was facilitated by the fact that Pilgrim's Pride did not care what Hiep Do's qualifications were; as practical matter, it made no difference to Pilgrim's Pride what the 'qualifications' of the person they intended to defraud were.  This under-estimation of Hiep Do was done (or more appropriately stated, not *done*) partially because Pilgrim's Pride never intended to let the contracts continue for an indefinite period. These facts have the effect of multiplying damages. Being an educated businessman, Hiep Do had numerous plans for Timberlake Farm, including hay production, cattle production, selling timber for profit, which in turn would clear the land for a pecan orchard.  All of which would have increased profits and the value of Timberlake Farm.  Hiep Do would not have invested hundreds of thousands of dollars had he not genuinely believed the venture was going to be profitable.

28.   Upon information and belief, this advertisement was placed by Defendant Truong Truong or by Louis Truong a.k.a. Luan Truong.[7]   Upon information and belief, said advertisement was authorized via the telephone and was paid for either by check sent by U.S. mail or by wire transfer via credit card. This advertisement and the sale of the farm were authorized by the owner of the farm, Alexander Hungngoc Nguyenlien, allegedly a resident of California, Texas or Louisiana.   This authorization was carried out by his "agent," Mr. Truong Truong. Truong Truong, Alan Truong and Adam Truong were the on site managers for Timberlake Farm prior to the Plaintiffs purchasing the farm.   There is informal indication that these other Truong family members had a financial interest in the farm as well.   In the alternative, the transaction was arranged by the Truongs, *on behalf of the Truongs*.[8]   In any case, Mr. Nguyenlien, as title owner of the surface fee of the

---

[7] The interconnectedness of the person in this transaction admittedly confuses the situation.  Upon information and belief, Mr. Truong Truong is the brother of Alexander Hungngoc Nguyenlien and is his "agent;" he also (was) the co-manager of the farm, along with his father Louis Troung a.k.a. Luan Truong.  Other individuals, related to these parties, Adam and Alan Troung were operating as site managers.  Truong Troung also signed correspondence to Pilgrim's Pride as "Agent and Attorney in Fact for Alexander H. Nguyenlien."  This correspondence was on the letterhead of J. Ken Muckelroy's Law offices.  Mr. Muckelroy was the title officer for the sale of the farm.   It is unclear weather Mr. Truong Truong has a professional relationship with Mr. Muckelroy.  Further, upon information and belief, Mr. Adam Truong, son of Mr. Louis Truong, signed some of the contract documents as Mr. Truong Truong, as agent for Mr. Nguyenlien.

[8] There is admittedly some confusion regarding the relationship of some of the parties in terms of their role in the conspiracy.  First of all, the Truongs are composed of, upon information and belief, Mr. Louis Truong a.k.a. Luan Truong, as well as 13 of his children.  These children included Truong Truong (the sellers agent), Adam Truong and Alex Truong (apparently the day-to-day managers of the farm) and Alexander Hungngoc Nguyenlien (who is either also Alex Troung or some other unknown person). In any case, Mr. Nguyenlien was apparently, the title owner of the farm.  Adam and Alan Truong were residents and site managers for the farm.  Further, these four

farm, was apparently represented by Mr. Truong Truong in this transaction, although it is unclear what was Mr. Truong's specific professional capacity.   After the Plaintiffs responded to the Truongs' advertisement via telephone wire, the Truongs, including Louis Truong and Truong Truong, made countless material misrepresentations about the farm and the business to the Plaintiffs.

29.   Either because Mr. Nguyenlien wished to exit the chicken business or was facing financial problems, or in the alternative, because Pilgrim's Pride had warned them that they needed to get a new owner or face cancellation (of their contracts with Pilgrim's Pride), the Truongs decided to get out of the chicken

---

individuals all made fraudulent misrepresentations regarding the farm.  Additionally, the Plaintiffs described to their counsel that they believe that there is, the very least, a financial relationship, if not a familial relation between the Truongs and Mr. Nguyenlien.  Initial investigation shows that there is at least the possibility that Mr. Nguyenlien was "straw purchaser" of the land.  The actual purchaser was Louis Truong.  When questioned by counsel for the Plaintiffs, Louis Truong repeatedly stated, "I sold the farm because…" and words to this effect.  Upon information and belief, because the Truongs, in particular Louis Truong, may not have been able to qualify for the property, they used Mr. Nguyenlien as a qualifier for the farm loan.  However, the revenues appear to have been funneled to the Truongs.  When revenues were disturbed by Pilgrims Pride to Mr. Nguyenlien, they were done so by check addressed to a Rosharon, Texas address south of Houston, Texas.  This revenue apparently approached a quarter of a million dollars in 2004. The location of this distribution is curious considering Mr. Nguyenlien "resides" in California.  When the sale of land was consummated, a check was issues to Truong Truong, who upon information and belief took and cashed said check himself.  These issues raise obvious tax questions.  While these indications do not necessarily bare on the validity of the transaction (although they may), they do at least call into question the truthfulness of the Truongs.  Once again, Mr. Nguyenlien never had any actual contact with the Plaintiffs (or so the Plaintiffs believed).  Mr. Nguyenlien was in every sense a silent partner to the transaction. *But as the Plaintiffs have alleged,* this silence regarding the genuine nature of the relationship between the Truongs, as well as the silence by the Truongs regarding the material condition of the farm, as well as the status of the contract between Pilgrim's Pride and Mr. Nguyenlien (which it would appear means the Truongs), is part of a larger conspiracy to induce Plaintiffs to enter a contract for sale of the land and contracts with Pilgrim's Pride.  In short, the Plaintiffs allege that the truth, in its entirety, seems to be a fluid concept for the Defendants, and this obtuse business arrangement and the lack disclosure regarding it further bolsters Plaintiffs' charges of misrepresentation.

industry.  After Plaintiffs' initial contact about Timberlake Farm was made with Mr. Louis Truong, virtually all of the conversations regarding the farm were had with Mr. Louis Truong, members of Truong family, Mr. Greg McCoury of Farmers State Bank, and Mr. Randy Ward of Pilgrim's Pride.  Further, Pilgrim's Pride specifically referred Plaintiffs to Farmers State Bank for all financing of the purchase of the farm. Pilgrims Pride *insisted* that Farmers State Bank alone was to be utilized for the transaction.  This is curious behavior given that allegedly two independent parties would be contracting for the sale of land that was not *owned* by Pilgrim's Pride. Plaintiffs aver that Farmers State Bank's involvement in the larger conspiracy serves a motivation for this insistence.  In reliance upon the Defendants' misrepresentations and pursuant to the residency requirements to live on the farm in the poultry contracts, Plaintiffs moved from Houston, Texas into a mobile home located on Timberlake Farm in Timpson, Shelby County, Texas.

30.    As detailed below, Farmers State Bank stood quietly by when Pilgrim's Pride misrepresented its position regarding the farm, the prior owners, and maintenance schedules.  Farmers State Bank then actively took part in Pilgrim's Pride's pretextual cancellation of the contracts.  Farmers State Bank then cooperated in the conspiracy to "take" Plaintiffs' farm based on a fraudulent premise. Farmers State Bank was intimately aware of material condition of the farm before the sale.

Farmers State Bank is also intimately aware that the Plaintiffs were treated far differently than the Truongs when they owned Timberlake Farm.

31.    As such, Farmers State Bank participated in the fraud described herein. Pilgrim's Pride, along with Mr. Truong Truong and Mr. Louis Truong on behalf of Mr. Nguyenlien, made numerous fraudulent representations for the purpose of inducing Plaintiffs into buying the farm.  These representations included, but were not limited to, the value of the farm, the profitability of the farm, the material and working condition of the farm, and the prospect for future profits.[9]  Along with this, there was a discussion that certain repairs would have to be made, but they would be split between the seller and the buyer and as for the buyer, the Plaintiffs, they would have "flexible" schedule in which to complete them.

32.    As it turned out, none of the previous owners repairs were completed (and were forced upon the Plaintiffs), and as the ink dried on the conveyance to Plaintiffs, Pilgrim's Pride aggressively reneged on representations of flexibility made to Plaintiffs regarding the condition of the farm.[10]  In fact, in spite of the prior representations to the contrary, a Pilgrim's Pride manager admitted to Plaintiff Hiep Do just after the close of the sale of the farm, that according to him, before the sale,

---

[9] This regards both contracts for poultry production and other business and other agricultural uses of Timberlake Farm.

[10] Representations of said flexibility was witnessed by Farmers State Bank, by and through its agent Greg McCoury.

the farm was on the verge of being shut down by Pilgrim's Pride for mismanagement by the Truongs.  This statement was made to Plaintiff Hiep Do and his brother.

33.     When Hiep Do asked that person why he did not tell him this before, he told Hiep Do that he had an obligation to Pilgrim's Pride and that the deal would not have gone through otherwise.  **This fact is extraordinarily important because it means that either (1) the Truongs were repeatedly cited for poor performance, these facts were withheld, and the Plaintiffs were fraudulently induced into the contracts, or this fact is not true, (2) the Truongs were *not* repeatedly cited.  If the latter is true, it tends to indicate that the Plaintiffs' treatment was unique (as compared with predecessors on this farm) and a mere pretextual vehicle to steal and extort money from and breach the contracts with the Plaintiffs.[11]**

34.     On or about September 2004 and later, Pilgrim's Pride and Plaintiff Hiep Do entered into several separate Breeder and Pullet Grower Agreements (hereinafter "contracts").  After the farm purchase was consummated and the contracts were entered into by the Plaintiff Hiep Do, Defendant Pilgrim's Pride cited Plaintiffs for pre-textual maintenance, cleanliness and bio-security violations despite *evidence* that Plaintiffs operated a cleaner operation than when the farm was operated by other

---

[11] In that, the instant Plaintiffs were cited for behavior that was never considered a problem until the Plaintiffs took over the farm.  Additionally, this would tend to indicate that (after the debts owed to Mr. Van Hoose were retired) the Plaintiffs were treated as Pilgrim's Pride treats its contract farmers nationwide. That is, as de facto indentured servants used to finance Pilgrim's Prides operations.

Plaintiffs' First Amended Original Complaint                                                  25

persons, in particular the prior owners of Timberlake Farm.[12]  On January 14, 2005, Pilgrim's Pride officially suspended all the contracts and "took over the farm" for, among other things, allegations of "gross negligence" in the management of the farm.

35.    The language of the January 14, 2005 letter sent to Hiep Do by Pilgrim's Pride purports to claim that the prior contracts allow for this action when the farm is run in a grossly negligent manner.   As of the date of this letter, Plaintiffs had addressed virtually every single item complained of and had invested an approximately $100,000.00 of capital improvements, new roads, equipment, supplies and materials.   Said investment was over and above the $336,500.00 invested in the purchase of the farm, and the $1.2 million capital investment loan on the farm.

36.    Frankly, it is hard to understand how nearly a half-million dollar investment and hours of back-breaking labor qualifies as "gross negligence."   Further, it is hard to understand how Plaintiffs performing all of the actions that were flatly avoided by the previous owners, who were *never* accused of said "gross negligence" now somehow qualifies as such.   Additionally, after Pilgrim's Pride took over the farm, it continued to do exactly the same things that were previously cited as justification for taking the farm over themselves.   **Plaintiffs have documented proof of this**.

---

[12] Which included the Truongs and former CEO of Pilgrim's Pride, David Van Hoose.

37.    After Plaintiffs' farm was 'taken over' by Pilgrim's Pride, Plaintiffs documented via videotape the management actions of Pilgrim's Pride in the operation of the farm.   These tapes demonstrate that the same workers and alleged practices utilized by Plaintiffs were utilized by Pilgrim's Pride.   Pilgrim's Pride even re-hired a worker that Plaintiffs fired for poor performance.   Somehow, when Plaintiffs performed in the described manner, it was 'gross negligence,' but when Pilgrim's Pride, the Truongs and possibly David Van Hoose did the same, the performance was acceptable.   Pilgrim's Pride took over all operations within the farm and prevented Plaintiffs from earning an income to support their family.

38.    Additionally, as stated above, before engaging Plaintiffs, the farm itself had an ongoing contract with Pilgrim's Pride in the name of Defendant Alexander Nguyenlien.   However, Pilgrim's Pride never really had any contact with this person. Defendant Alexander Nguyenlien also had a farm loan with Farmers State Bank. This person was not present for the purpose negotiating the sale of the farm.   In fact, the Greg McCoury of Farmers State Bank stated that he had only met this person once, ever.[13]   Rather, all representations that were made on behalf of Mr. Nguyenlien were made by Truong Truong or Louis Truong, Pilgrim's Pride and Pilgrim's Pride representatives including Randy Ward.   Additionally, other representations, through

---

[13] At an October 12, 2005 meeting discussed below.  Amazingly, the banker, Greg McCoury, had loaned this person in excess of a million dollar loan and had only met him once.  Further, this was the same person that had a chicken contract with Pilgrim's Pride.  Greg McCoury called and visited with Plaintiffs regularly regarding the chicken contracts.  However, the previous owner and previous Pilgrim's Pride contractor had only met with a representative with the Bank once.

omission, were made by Mr. Greg McCoury and Mr. Luke Motley of Farmers State Bank ("the Bankers" involved in this transaction).

39.    To further complicate the situation, Truong Truong's name appears in correspondence to Pilgrim's Pride on the letterhead Mr. J. Ken Muckelroy, who owns Professional Title Services, the Defendant title company that was used in the sale of Timberlake Farm to Plaintiffs.    When trying to understand this situation, it is sometimes best to bear in mind that virtually every person is connected financially in this situation.   There is an interlocking conspiracy of person who, within their own individual industries, contributes to the over-all transaction so that they can make money for their individual role.

## B.  **Defendants' Individual Conduct**

### i.  **The Truongs**

40.    Louis Truong and Truong Truong, along with several members of their family (collectively the "Truongs"), represented to Plaintiffs that in order to purchase the farm, he would need to get a contract with Pilgrim's Pride.   They further represented that the farm was under current contract and that the farm "was in perfect working order," and that "everything worked fine."  They further represented that the farm "was making money."   They represented that they were in good standing regarding the contract with Pilgrim's Pride.   They additionally produced financial reports in support of this contention.   While it is likely true that the Truongs were

making money with this farm, there is also information that indicates that this was because Pilgrim's Pride routinely renewed Mr. Alexander Hungngoc Nguyenlien's contract and did not require him to do anything to maintain or improve the farm. Further, the Truongs made numerous misrepresentation to induce Plaintiffs to purchase of the farm, including but not limited to the following:

- Louis Troung a.k.a. Luan Truong told Plaintiff Hiep Do that his family invested with a relative of his (Alexander Hungngoc Nguyenlien "Alexander")[14] and that he lives in California.   Further, Louis Truong fraudulently stated that he had a dispute with this relative, and thus was motivated to sell the farm. This is apparently false or at least a half-truth.  It actually appears that Alexander is Louis Troung's son[15] and that he either visited the farm from time to time or that Alexander was actually on the farm from time to time pretending to be someone else.  In any case, Plaintiffs were never formerly introduced to the this person and, upon information and belief, Pilgrim's Pride and Farmers State Bank do not know who this person is or have had minimal contacts with him.  Further, Pilgrim's Pride did not know who

---

[14] In actuality, this person is his son.  For reasons unknown, he never divulged this information to Plaintiffs.  Further, Mr. Truong was interviewed by counsel of the Plaintiffs and he stated that he had no way to contact this "son" who owned the farm.  However, Counsel for the Plaintiffs had another Vietnamese speaking individual call Louis Truong and ask for his son (Alexander).  They were immediately given the phone number.  It is clear that this family has a persistent pattern of concealment.

[15] According to Louis Truong himself.

Louis Truong was.[16]   Upon information and belief, Alexander from time to time lived on the farm, and traveled between Texas, Louisiana and California. Louis Truong told Plaintiffs that the reason they want to sell this farm where he and a "relative" that owns the farm did not get along[17] regarding the investment into this farm, and that Alexander didn't want to work.   Louis along with his other Family members made various other representations to Plaintiffs, including:

- Louis Truong and Truong Truong represented that the farm generated income of over half million-dollars a year and made "good profit."   The farm required just one person to manage it. Work was primarily accomplished by day laborers that were inexpensive to hire.

- Louis stated that the farm timber had been appraised at $300,000.00.

- Louis stated that the farm was in "good shape" and that "all his children had to do was go out in the morning feed the birds and go

---

[16] Further, it stands to reason that if Pilgrim's Pride did not know who owned the farm or who was the other contracting party, it would be difficult to 'correct' improper management of the farm.  In other words, not only do the instant Plaintiffs aver that Pilgrim's Pride did not correct mismanagement prior to Plaintiffs' arrival as owner of said farm, Pilgrim's Pride is not even sure who it had a contract with or who was managing the farm.

[17] On information and belief, this was false.  Plaintiff Hiep Do has had contact with Truong Troung, and Troung Troung has represented that there are not ill feelings within his family, including Alexander, his brother.  If this is true, then once again, Louis was lying about his situation.

back the trailer and sleep or do whatever they want.  [After that] you [the owner] do not have to worry any more." That "all the workers [day laborers] take care the farm for the rest of the day."

- Louis stated that he wished he had money and was younger so he could buy out his relative's part.[18] He said the work was easy and that "there was not much to do on the farm, but that sometime it was busy when it was time get ready for the delivery of a new flock of chickens," after that, "just wait and collect the  money."

- Louis Truong stated the service men (Pilgrim's Pride employees that supervise the farm) and his kids (who were living on and working on the farm) were on really "good terms," and that "they go out to eat together a lot, and are always joking around."

- Additionally, Louis and his family represented that the fields on the farm not related to the chicken business generated extra income by selling hay each year, generating four to five thousand dollars each year.

- Louis Truong and Truong Truong also stated "a lot of people want to buy 'litter,'" and that Plaintiffs "could make $45 to $55 a spreader truck to spread to other farm."

---

[18] Later, however Louis said that "he" sold the farm to Plaintiffs.

Plaintiffs' First Amended Original Complaint                                    31

- The Truongs represented that this farm generated 1/8 of Pilgrim's gross income in the area.

- Louis repeatedly called Plaintiffs and stated that if the farm was not purchased soon, the farm would be sold to someone else, provided that that they could get financing.

### ii. Farmers State Bank

41.     Farmers State Bank operates five locations in East Texas.   Upon information and belief, Farmers State Bank performs almost all of the local financing for deals involving Defendant Pilgrim's Pride.  Mr. Nguyenlien financed his original purchase of Timberlake Farm through Farmers State Bank.  The Bank coordinated the appraisal of the farm, accepted the deposit, and received interest on money loaned.  When Mr. Nguyenlien either fell into financial difficulty or simply decided to leave the chicken industry, Farmers State Bank risked the possibility that he would default on the loan given to him.  In the alternative, Pilgrim's Pride was threatening to "close down the farm."[19]

42.     In order to avoid bad debt and to accrue *another* deposit from which to gain interest on, Farmers State Bank helped Mr. Nguyenlien sell the land by knowingly withholding material facts about the farm, making fraudulent

---

[19] The reason this is unclear is because to the extent it is true, these facts were materially hidden from the Plaintiffs until after the contracts were signed.  At least one Pilgrim's Pride official stated after the closes of the sale of the farm to Hiep Do that Pilgrim's Pride was about to shut the farm (under the Truongs' management) down.  Troung Troung was asked by counsel for the Plaintiffs if this was true and he refused to answer.

representations about the farm, and coordinating favorable appraisals of the farm. Farmers State Bank succeeded in its plan, as Plaintiffs made their down payment and earnest money at the Bank, from which the Bank received interest and avoided taking the write-off of Mr. Nguyenlien's debt.

43.     After Plaintiffs contacted Mr. Truong Truong, Mr. Truong Truong and Louis Truong informed Plaintiffs that in order to purchase the farm, they must obtain a contract from Pilgrim's Pride.  As such, Plaintiff Hiep Do contacted Pilgrim's Pride. Pilgrim's Pride then in turn informed Plaintiffs that financing would *have* to be arranged through Farmers State Bank alone, and to contact a Mr. Greg McCoury at the Bank.  This is not the first time that Greg McCoury has been involved in a chicken farm financing scam that has gone awry.  Upon information and belief, one poultry farmer (in an unrelated contract situation, similar to the instant situation) became so enraged that he murdered one person and shot another related to his treatment under a chicken contract and the mortgage to his farm.[20]

44.     A special relationship was developed between Farmers State Bank and Plaintiffs that must be discussed at length.  The relationship between Farmers State Bank and Plaintiffs was not an "arms length" transaction between these two parties. Nor was it a conventional lender-borrower relationship.  Rather, the relationship was predicated on several factors.  As a primary matter, when Plaintiffs contacted the

---

[20] Dave Mann, "Getting Plucked:  Texas chicken farmers become modern-day sharecroppers," The Texas Observer, March 18, 2005, at page 6-7.

seller of the property, he was informed by the seller that he would have to obtain a contract from Pilgrim's Pride.  Pilgrim's Pride in turn informed Plaintiffs that he would have to obtain financing from Farmers State Bank.  Plaintiffs were not "allowed" to use any other financial institution.  What has become apparent is that there was an extreme amount of cooperation between Farmers State Bank and Pilgrim's Pride.  Pilgrim's Pride insisted on Farmers State Bank being used because Pilgrim's Pride new that it could count on Farmers State Bank's complete cooperation in all matters related to the farm.  Upon information and belief, Farmers State Bank has handled the sale and purchase of this particular farm more than once and, upon information and belief, handles virtually all of the financing for farms for Pilgrim's Pride in East Texas.

45.    After the Bank was contacted by Plaintiffs, the Bank arranged for an appraisal by William C. Brimhall d.b.a. Brimhall Appraisal Services, a company handpicked by Farmers State Bank.  This company handled the last appraisal of the farm and as discussed below, resulted in an inflated value for the farm.   This ultimately resulted in Plaintiffs placing $336,500.00 in a down payment and earnest money with Farmers State Bank as payment for the farm.  Beyond this, and more importantly, Farmers State Bank came to exert undue control over Plaintiffs' business.  Bearing in mind that Plaintiffs invested $336,500.00 in down payments and earnest money (not to mention capital improvement later), and bearing in mind that at

least outwardly Plaintiffs were Farmers State Bank's customers, one would naturally believe that the Bank should be operating *in Plaintiffs' interest*, or at least not in a manner that damaged Plaintiffs.

46.    However, extraneous facts and conduct demonstrate this lender's control over, or influence in, the Plaintiffs' business activities.   These extraneous activities include, knowledge regarding the previous owners and the material condition of the farm.   Farmers State Bank then fraudulently failed to disclose this information to Plaintiffs.   It is crucial to realize that either the previous owners were on the verge of having their contracts cancelled (which was later claimed by Pilgrim's Pride manager) and this fact was withheld by all parties, or the contract was not on the verge of being cancelled and if not, Plaintiffs were treated grossly unfair.

47.    It really does not matter which one of these scenarios was in place, or even whether there was some sort of combination thereof.   Farmers State Bank was far too involved in the transaction not to be aware of either one of these scenarios and as such, cooperated in Plaintiffs' contractual demise.   This cooperation between Farmers and Pilgrim's Pride included the Bank's involvement in insisting on "improvements" being made and followed by cooperating to create a "paper trail" that was used a justification to terminate the contracts, which in turn contributed to the loan failure.

48.    The Bank took an interest not only in the servicing of its note, but also in how Plaintiffs conducted his business day to day.[21]   Ultimately, this resulted in the total takeover of Plaintiffs' business.   This created a *fiduciary* relationship between the Bank and the Plaintiffs.   Even though the Bank held almost a half of a million dollars of Plaintiffs' money, the Bank took steps to assist others in destroying Plaintiffs' ability to pay, which in turn benefited the Bank to the detriment of Plaintiffs.   Pilgrim's Pride would often contact the Bank to discuss the operations of the farm.   The Bank would in turn contact Plaintiffs and insist that Plaintiffs produce this or that improvement.

49.    The Bank even accompanied Pilgrim's Pride on "inspections" and personally engaged in attempting to "correct" Plaintiffs' behavior.   Pilgrim's Pride's own documents and the factual averments of Plaintiffs demonstrate that the Bank took an active role in assisting Pilgrim's Pride in insisting that certain repairs and capital improvements be made, that the farm be run in a certain manner, and in producing a spurious "paper trail" used as a justification for canceling the contracts. Farmers State Bank failed to disclose that they were not "independent" of Defendant Pilgrim's Pride.

---

[21] Once again, this was not an arms-length transaction.  Note Greg McCoury's admission that he only met with the previous owner once. Compare this with the numerous visits, calls and meetings that he had with Plaintiffs regarding Plaintiffs' 'management' of the farm.

50.    Farmers State Bank exercised dominion and control over Plaintiffs' business and further made a transaction that was already not at arm's length, even less so.  These corrections included the capital improvements that had to be made on the farm.  The problem is that to the extent there was *any* problem with Plaintiffs' performance, it can be reasonably argued that it was as result of having to divide interests between farm operations and improvements, all of which were required to be *immediately* performed.  Farmers State Bank was aware of the "flexible" schedule that was promised to Plaintiffs by Pilgrim's Pride.  Not only was the Bank aware of the reversal of this promise, it actively participated in acting contrary to it.  The behavior is particularly egregious because Farmers State Bank was well aware (as was Pilgrim's Pride) that the previous owners were ***never*** required to uphold a similar standard and were never "corrected" in any such matter.[22]   Strictly speaking, Plaintiffs had their contracts tortiously cancelled for behavior and performance that was *a substantial improvement* over the previous owners.

51.    Both Greg McCoury and Luke Motley, III of Farmers State Bank made numerous material misrepresentations and omissions to Plaintiffs.  Both gentlemen actively integrated with Pilgrim's Pride and both contributed to the demise of the contracts with Plaintiffs.  Greg McCoury is discussed in Pilgrim's Pride's memos regarding how he sought to gain capital improvements on the farm (for Pilgrim's

---

[22] Once again, consider Greg McCoury's singular visit with the prior owner.

Pride) and to assisted Pilgrim's Pride in its pretextual behavior, all the while ignoring the prior representations of a "flexible schedule" by Pilgrim's Pride to Plaintiff Hiep Do.   Both of these Defendants, according to Pilgrim's Pride, agreed with and participated in the plans to "divide up" the farm after it was nefariously taken-over. The ultimate results of this behavior was that Pilgrim's Pride, in concert with Farmers State Bank, cancelled Plaintiff Hiep Do's contracts and obtained complete control over his management and business regarding the farm.

52.   Farmers State Bank took an active role in fabricating this pretext for breach of contract by the Plaintiffs.  Farmers State Bank was aware of the 'flexible' repair schedule that was promised to Plaintiffs by Randy Ward of Pilgrim's Pride, but did nothing to advocate on Plaintiffs' behalf.   In fact, Farmers State Bank actually attended some of the "inspections" that Pilgrim's Pride conducted.   Farmers State Bank "discussed" Plaintiffs' responsibilities to Pilgrim's Pride.   Farmers State Bank, the holder of Plaintiffs' down payment, earnest money, countless hours of sweat equity, and the loan on Timberlake Farm, actively took part in justifying the cancellation of the contracts.  This gave the Bank a windfall that allowed the Bank to keep the down payment, earnest money and capital improvement money that was paid by the Plaintiffs on Timberlake Farm.

53.   Although the instant mortgage exists in the commercial context, ***Farmers State Bank engaged in equity stripping.***  On November 1, 2005, Farmers

State Bank foreclosed on the Deed of Trust attached to the mortgage on Timberlake Farm, which stripped every dollar of equity Plaintiffs' owned in Timberlake Farm. Upon information and belief, Plaintiffs assert that the Farmers State Bank has done this on a materially significant number of times and that this conduct is done knowingly and intentionally.

54.    All of these factors contributed to the eventual dissolution of the relationship between Plaintiffs and Pilgrim's Pride.   Either because Farmers State Bank wished to misappropriate the deposit money, *strip Plaintiffs' equity in said farm*, or because it wished to "play ball" with Pilgrim's Pride (or all of the above) and therefore guarantee further business "referrals," the Bank chose its interest over the interest of persons with whom it had developed a special relationship.

55.    Farmers State Bank's actions are documented in Pilgrim's Pride's documents that Pilgrim's Pride attempts to use to show Plaintiffs alleged mismanagement.   This includes the below described "plan" to divide up the farm. Bearing in mind that the Bank had not yet foreclosed and bearing in mind that there had not been any judicial determination that the cancellation of the contracts was legal, Farmers State Bank "agreed" that the farm should be taken, divided and resold to several other persons.   Pilgrim's Pride (along with the Bank) 'decided' that all of these new buyers all would as well enter into contracts and improve the farm in a similar fashion.

56.     The Bank and Pilgrim's Pride were deciding the direction and division of a business, centered on property that they did not own and with out so much as a seconds thought about the near half million dollar investment by Plaintiffs.  Farmers State Bank and Pilgrims Pride failed to treat the Plaintiffs with simple honesty in fact. Farmers State Bank and Pilgrim's Pride's hidden agenda in dealing with Plaintiffs is demonstrated by the unfair treatment of Plaintiffs in the contracts, especially in light of the treatment of previous contracting parties, and by the Defendants seeming lack of concern about the significant sums of money that were being careless destroyed or taken by the Defendants by their conduct.   Not only was there a breach of a fiduciary duty, a violation of the duty of good faith and fair dealing, but also this behavior was also a form of economic duress both under Texas common law and as herein described in the RICO charges.

### iii.  Brimhall Appraisal Services

57.     Brimhall Appraisal Services ("Brimhall") operates one location in East Texas.  Upon information and belief, Brimhall performs all appraisals on chicken farms for Farmers State Bank.  The Bank contracted with Brimhall to estimate the market value of the fee simple interest of the Timberlake Farm on July 26, 2004.  In the short span of 16 days, a valuation is produced, memorialized in a *165-page report*.  In spite of the fact that the report includes a list of items given to Mr. Brimhall by Pilgrim's Pride which detail some "repair and improvements" that will

have to be made, the value of the farm increased by around $400,000.000 in a little over 13 months from the last appraisal issued by Brimhall on the same farm.

58.    In other words, in spite of the clear indication that the prior owner had allowed the farm to fall into disrepair (as detailed further below) the value was now "independently" appraised to have appreciated by over 30%.  Brimhall performed the appraisal with the knowledge that Farmers State Bank would use the appraisal to induce Plaintiffs into purchasing Timberlake Farm or to justify the loan.  Later in discussing these issues with Farmers State Bank and Plaintiffs' counsel, the Bank expressed a concern that the farm was now valued at almost nothing after the fact. This, however, tends to indicate that either the farm was overvalued (at the Bank's behest) or that the basis of the value was largely the value of the contracts.  If this is true, it means that the Bank arranged to have a piece of land valued based on the contracts.  These very contracts were then interfered with tortiously by Farmers State Bank.   After the contracts were pretextually cancelled, the Bank then sought to foreclose on the farm, whose value was in actuality a financial sham.

### iv.  Pilgrim's Pride and Professional Title Services, Inc.

59.    Once this miraculously quick appraisal was produced, Greg McCoury at Farmers State Bank contacted Pilgrim's Pride for their input into contract possibilities at Timberlake Farms.  Additionally, Plaintiffs met with Mr. Randy Ward, a manager with Pilgrim's Pride, and showed Mr. Ward the financial statements they had been

given by the Truongs. Plaintiffs also produced a business plan that reflected projected revenue, based on prior representations.  These projections were based on financial documents given to Plaintiffs by the Truongs, Truong Truong in particular.  The documents include payments by Pilgrim's Pride to both the Truongs and the owner that preceded the Truongs, David Van Hoose.

60.    The purpose of this plan was twofold.   First, it was designed to demonstrate that Plaintiffs were capable of planning for and running a farm.  Second, *it was an inquiry with Pilgrim's Pride as to the financial viability of the farm and the prospect for making money on the farm*.  In other words, Plaintiffs literally asked, "do these numbers look correct?" After all, the farm was supposed to pay the mortgage on the farm, as well as generate income for Plaintiffs after operating costs.

61.    **Pilgrim's Pride, through its employee and manager Mr. Randy Ward, agreed that these financial projections were "reasonable**."  Additionally, it was explained that some minor repairs and improvement would have to be made to the farm, and although a schedule was produced for said repairs, Mr. Do was told that the repair schedule would be "flexible."  This promise of flexibility was repeated more than once on repeated inquiry, and was witnessed by several other persons besides Hiep Do.  In fact, these promises were made within earshot of the Banker, Mr. McCoury, who later confirmed that he heard this promise being made.

Eventually, it was agreed that the prior owner would perform some of the repair and the new owner would finish the rest.

62.    As the day of closing approached on the farm loan and the contracts, the Truongs, in keeping with their consistent pattern of *ignoring* repair and maintenance schedule, had completed none or virtually none of the repairs needed to consummate the deal.  As closing approached, and as the possibility of the agreement dissolving loomed, a dispute erupted between the prior owner, in which Mr. Truong Truong represented to Plaintiffs that Pilgrim's Pride would be responsible for covering the cost of the prior owner's repairs.  The Truongs' agent and Plaintiffs agreed that part of the money associated with the purchase of the farm would be put in escrow to cover part of the cost of repair.[23]

63.    Further, upon information and belief, Pilgrims Pride took advantage of this dispute and while this debate was ongoing, Pilgrim's insisted that all contracts be signed *immediately*.  Although the contracts were signed (both for the production of chickens and for the sale of the farm), no copies were provided to Plaintiffs.  It was

---

[23] Shortly after the contracts began, Pilgrim's Pride became increasingly belligerent about the pace of repair and improvement.  In addition, although it was fully aware of the existence of the escrow, which could be used for the repair or replacement of any item listed in the various lists, it rather insisted that all items be done now.  To the extent that any item listed serves as the central basis for the termination of the contracts, never once did Pilgrim's Pride approach Plaintiffs and insist, for example, that new freezers be purchased with the money.  Rather, they engaged in a continual process of "moving the ball."  When one thing was fixed, something else was complained of.  Pilgrim's never said purchase the freezers with the money and produce a receipt for same or the contracts will be canceled.  As a result, Plaintiffs were left with the impression that the escrow was supposed to be spread out in defraying the costs of all the repairs, which in fact far exceeded the value of the escrow.

only later that copies were provided, some signed, some unsigned and some, upon information and belief, containing certain clauses were not included as attachments to the contracts presented during signing and closing.[24]   Additionally, it would appear that J. Ken Muckelroy through Professional Title Services, Inc. cooperated in this conspiracy.  Oddly, Mr. Muckelroy acted in this conspiracy as title officer and may have acted as counsel for the Defendant Farmers State Bank.  Mr. Muckelroy is well aware that a full and complete copy of the contracts should have been tendered to Plaintiffs at closing.   Further, Professional Title Services has refused to allow Plaintiff Hiep Do review his title file.  The few papers that were given demonstrate a discrepancy between what was given at closing (nothing), what was given to Plaintiffs later and what was (and is) contained in the title file.  These documents, as concocted as they would appear to be, are being used by Pilgrim's Pride against Plaintiffs.

---

[24] Later, when Plaintiffs approached the title office owned by Ken Muckelroy, the title office refused to give a *complete* copy of the contract and other documents filed with the title office during closing.  The reasons given for this are unclear. Later, it was curiously noticed that a letter signed by Truong Truong, agent for Mr. Alexander Hungngoc Nguyenlien (the farm seller), instructed Pilgrim to terminate its contracts and forward any bonus to Plaintiff Hiep Do, was written *on J. Ken Muckelroy's letter head*.  This alone indicates some relationship between the person representing the seller, and the person who handled title matters for the sale, Mr. Muckelroy.  Suspiciously, there appeared to be multiple copies of the production contracts, some signed, some not singed, some with one type of 'attachment,' some with another, some with no attachment.  In fact, the copies that were given to Plaintiffs at the title office, which presumably were given to the title officer on the day of sale, had no attachment describing "disposal of dead birds."  Curiously, even though this issue was not specifically addressed in the numerous memoranda/letters from Pilgrim's Pride, some how after the fact, it becomes an issue and copies with favorable attachments appear. Plaintiffs aver that this might have something to do with the conspiracy, but also aver that Pilgrim's Pride has acted fraudulently in other matters and some consideration may need to be given to this "attachment" situation in the future.

64.    While the ink was barely dry on the contracts (in spite of representations of profitability and flexibility by the seller and Pilgrim's Pride), a Pilgrim's Pride official outrageously confessed to Plaintiff Hiep Do that his wonderful investment was on the verge of being shut down because of its poor management and state of repair by the prior owners, the Truongs.   In response to this shocking revelation, Plaintiff Hiep Do asked, "why didn't you tell me this before?"   The Pilgrim's Pride official responded that he had a moral obligation to the company not to warn him, because otherwise, he (Hiep Do) never would have entered the contracts.[25]   ***This is an admission of fraud in the inducement.***   After hearing of this from the Pilgrim's Pride manager, Hiep Do went to Professional Title Services to see if was possible to get out of the contracts and land sale.   The owner of Professional Title Services, J. Ken Muckelroy, told Mr. Do that the deal was done and he could not do so.   It cannot be over

65.    One of Plaintiffs' first signs that something was wrong was Pilgrim's Pride's first "general requirements" sent to Plaintiffs about the repair of "bird freezers."   In spite of being told that the schedule was flexible, the "deadline" for repair *was eight days after closing on the farm*.   As it turns out, because the prior owner (or rather his management) had left them in such filthy condition (as discussed below in "biosecurity"), the repairmen Plaintiffs hired to work on them refused to do

---

[25] Or words to this effect.

so.  Pilgrim Pride first complains of this (among other things) in writing less than two weeks after closing on the farm.   This written complaint followed a rational explanation by Plaintiffs for any delay, a reminder to Pilgrim's Pride of the flexibility of schedule that was promised, and the great efforts that were being made to fix all of the problems.

66.    It must be realized that Pilgrim's Pride was requiring Plaintiffs (*as later became apparent*) to (1) run the farm; (2) make massive repairs and improvements (involving over $100,000.00 in costs) to the farm; and (3) do so on a tyrannical and draconian scheduled that, on information and belief, was designed to induce failure. Plaintiffs' *first* priority was to tend to the chickens on the farm, then repair and/or improve the farm.

### Economic Extortion

67.    From almost the beginning, Pilgrim's Pride engaged in a constant program of abusive tactics to "speed the process" of capital repair and improvement along by (1) inspecting and (2) writing warnings regarding normal, day to day maintenance items punctuated by reminders about the "list of repairs."   These warning were accompanied by implicit or even explicit threats to cancel contracts. These contracts were responsible for servicing the mortgage that Plaintiffs were *carrying for Pilgrim's Pride off balance sheet accounting scam*.

68.     Once again, Plaintiffs were paying the capital cost of the farm, its labor, its equipment, the farm's repair and improvement.  This was in addition to running the farm.  As a recurring theme, Pilgrim's Pride treated the farm as if it was its own. The implicit and explicit tone of every interaction that occurred after the contracts were signed was "do every thing we say, both in terms of management, improvement and repair, do so immediately or we will pull the contracts."  If the contracts were pulled, Plaintiffs were faced with loosing their down payment and earnest money totaling $336,500.00, their approximate $100,000.00 in capital improvements, countless hours of sweat equity, and all the while being constricted with a mortgage note for approximately $1,220,000.00

69.     Plaintiffs engaged in a process of furiously attempting to run the farm, address day-to-day issues, and repair and or replace items as required. These items include items not done by the Truongs that were supposed to be completed before the close of sale.  For example, as soon as 15 days after the closing of the contracts, a memo was sent by Pilgrim's Pride to Hiep Do regarding the alleged poor management of the farm and items.

70.     The majority of the items listed on these reports can be described as maintenance items.  One must bare in mind that there were live chickens involved here – a flock of thousands of chickens will from time to time dislodge a wire or move a barrier.  Chickens instinctively "peck" at things.  The chickens required

constant maintenance.   Still Pilgrim's Pride would come by on occasion, note that something was out of place and complain that this was being disregarded.   Really, however, these complaints were a mere pretext.   Virtually every single action item mentioned was repaired, replaced or fixed.   Plaintiffs invested approximately $100,000.00 dollars in repair, replacement, and up-grades.   This was money spent on the farm, above the purchase price, in order to make Pilgrim's Pride satisfied with the condition of *Plaintiffs' farm*.

71.   On September 10, 2005, a complaint letter was sent mentioning "biosecurity."   The main complaint was that the chicken freezers were not fixed. Freezers were supposed to be utilized by prior owners to store dead birds.   After these freezers were full, ***Pilgrim was supposed to come, empty them, and dispose of the dead birds.***   This means that Pilgrim's Pride was ignoring its own biosecurity measures.   Mr. Do explained that he was delayed in fixing the freezers because he had to clean them out.   Why?   Because the previous owner filled them with chickens, and either never fixed these broken freezers, or worse, never even turned some of the on, (presumably to save on electricity costs).   Because these freezers were now so filled with vile rotting chickens, repair people would not even touch them.   Plaintiffs has documented proof that these freezers were not working at least as far back as April of 2004[26] and facts to support that they were not being used properly by the

---

[26] As indicated in documentation provided by Pilgrim's Pride.

previous farm owners.   This means that the previous owner, as well as Pilgrim's Pride, had been violating the "biosecurity" they now cited.

72.     So, all the while trying to run the farm, fix the other items being harped about in memorandum, such as improving the farm's roads – Plaintiffs proceeded to get some freezers running, started to clean others and ordered a new incinerator.  That incinerator arrived in October of 2005 and was brought online in November of 2005.

73.     On October 13, 2005, Pilgrim's Pride cancelled some of the contracts with Hiep Do citing (1) a list of seven items and a (2) a failure to repair or replace freezers.   First, within the seven-item list *all of the items were in fact addressed except for two*, items 2 and 6.   *However*, the due date for both of these items was "before the next flock."   In other words, these items could not have been "late;" they were not due because the next flock of chickens had not arrived.  The other item was the "freezers."   The reason for the delay was clearly explained to the management of Pilgrim Pride.   Further, acceptable steps were taken to replace the freezers with an acceptable alternative.  In spite of this, the contracts were cancelled.

### "Biosecurity" or "Bio-ruse?"

74.     In a letter sent to Plaintiffs by Randy Ward of Pilgrim's Pride on September 20, 2004, it states that Pilgrim's Pride takes biosecurity *very seriously*. Biosecurity in general terms can be defined by as ensuring that disease does not reach the flocks at the farm.   This security is generally addressed by (1) ensuring that

disease does not enter the flock by following cleanliness and disinfection procedures from individual or equipment from other locations and (2) by removing dead birds from the flock in the event that they may be sick.

75.    However in this context, Pilgrims behavior amply demonstrates that the "fuss" over Biosecurity is a ruse.  It was used initially as a "carrot and stick" behavior to speed along capital improvement to the farm and later as a pretextual justification for canceling the contracts when Pilgrim's Pride came to believe they had squeezed as much money out of Plaintiffs as they could.

76.    Factually, at least as far back as March of 2004, these "freezers" were not being used.  These freezers were designed to hold dead birds *until Pilgrim's Pride picked them up*.  As far as the Plaintiffs can determine, these freezer have never been emptied by Pilgrim's Pride.  Certainly, they had not been emptied for *literally* months before Plaintiffs obtaining the farm.  This means that Pilgrim's Pride was ignoring biosecurity themselves and hardly represents taking "biosecurity very seriously."

77.    In fact, the previous farm owners (prior to Plaintiffs) were routinely (1) disposing of dead birds by throwing them in the woods behind the farm and/or (2) simply sticking them on broken or disabled freezers.  In May of 2004, at least one Pilgrim's Pride farm, *not* associated with this suit had to be destroyed because of a

"biohazard."[27]   However, during this same period, Pilgrim's Pride had constantly given contracts to Alexander Hungngoc Nguyenlien and the Truongs, in spite of the fact that they had "broken freezers" and were "dumping birds" in the woods about back of the farm.  Now, why would this be?

**"…Safety and health of our consumers is our first concern,"
David Van Hoose, Pilgrim's Pride, (former) Chief Executive Officer.**[28]

---

[27]  *See* LISA FALKENBERG, Associated Press Writer, Friday, May 28, 2004: "Commercial chicken farm in Texas isolated, about 24,000 birds destroyed after bird flu found." About 24,000 chickens were destroyed after avian flu was found on a Texas farm that supplies chickens to the poultry giant Pilgrim's Pride, state officials said Friday. Routine blood tests at the farm discovered the infection. Pilgrim's Pride, the second-largest poultry producer in the United States and Mexico, said the farm supplied less than one percent of the company's flock. Texas agriculture officials said the disease does not compromise the safety of cooked poultry. 'I don't see any reason for worry on the part of consumers as a result of what we've seen in this flock,' said Dr. Max Coats, a poultry expert with the Texas Animal Health Commission.  The destroyed chickens did not produce eggs for consumption. Eggs from this farm are taken off site for hatching and become broiler chickens, he said. Pilgrim's Pride officials said no products left the farm for other operations, and that there was no reason to be alarmed. However, the company's shares fell 99 cents, or 3.6 percent, to close at $26.88 in trading on the New York Stock Exchange. Testing done at the farm about 10 days ago found a "significant number' in the flock showed antibodies to bird flu, Coats said. After the test results came back, the farm was isolated and the flock was destroyed and buried Thursday, state officials said. 'Our first priority in Hopkins County was to ensure that the birds were promptly and humanely euthanized, then buried on site, to prevent the potential transmission of disease to other flocks,' Dr. Bob Hillman, Texas state veterinarian and executive director for the Texas Animal Health Commission, said in a statement. 'Our poultry testing in Texas is believed to be the most aggressive in the nation, with every breeder flock tested every 10 weeks,' he said. 'As a result of this diligence, we believe that the virus can be contained, particularly since the flock is so far from any other poultry farms.'"

[28] *See* October 16, 2002 New York Times/AP/ Knight-Ridder Tribune <u>WASHINGTON MEAT PLANT'S PRODUCTS ARE SEEN AS PROBABLE SOURCE OF BACTERIA</u> "Stephen Cohen, spokesman for the U.S. Department of Agriculture's food and safety and inspection service, was cited as saying Wednesday that turkey and chicken products of the Pilgrim's Pride Corporation are likely to have been a source of the listeria that caused seven deaths in seven Northeast states, adding, 'We found the outbreak strain in three samplings we took but we're continuing the investigation. This is a significant discovery but we cannot say this is conclusive. 'Representative Nita M. Lowey, Democrat of New York, was cited as writing Secretary of Agriculture Ann M. Veneman asking that she adopt regulations to better control listeria that were initiated by President Bill Clinton, adding, 'It is a serious public health threat.' Three people in counties around New York City have died in the recent outbreak. Pilgrim's Pride chief executive officer David Van Hoose, who went to Franconia from the company's Texas headquarters, was cited as saying that workers at the

---

78.    Plaintiffs have discovered that the owner before Mr. Alexander Hungngoc Nguyenlien was a Mr. David Van Hoose.  David Van Hoose is a former CEO of Pilgrim and a member of the board of directors.   While he was assigned locally as an executive for Pilgrim's Pride, he owned and derived income from Timberlake Farm.  When Mr. Van Hoose sold the farm to Mr. Nguyenlien, Mr. Van Hoose personally carried part of the note for the farm – for $150,000.00.  **Mr. Nguyenlien was in debt to Mr. Van Hoose for $150,000.00**.  Before this, the farm was owned outright by Mr. Van Hoose.  Mr. Van Hoose along with Pilgrim's Pride apparently "hatched" a substantial vehicle for garnering extra money for Mr. Van Hoose, in that in at least one prior year the farm under Mr. Van Hoose earned in excess of a half million dollars.  Upon information and belief, the Plaintiffs believe there is evidence to support that the farm was not being held to the same "biosecurity" standards now being used as a pretext against Plaintiffs.

79.    Due to Mr. Van Hoose personally holding $150,000.00 note on the farm to the Truongs, Pilgrim's Pride apparently allowed Mr. Alexander Hungngoc Nguyenlien and the Truongs to run Timberlake Farm into the ground without the tyrannical mandates that were made upon the Plaintiffs and other chicken farmers for

---

Wampler plant yesterday were 'scrubbing walls and breaking some of the equipment down to its most basic level to make sure it's thoroughly cleaned' with disinfectants." Van Hoose was later quoted regarding this issue as saying "Safety and health of our consumers is our first concern."

Pilgrim's Pride.   Upon information and belief, Pilgrim's Pride intentionally and knowingly allowed Mr. Alexander Hungngoc Nguyenlien and the Truongs to run Timberlake Farm as they wished in order to protect the capital investment of Pilgrim's Pride's former CEO.

### "Which came first, the chicken or the greed?"

80.   It would appear that as long as the farm was owned by either Mr. Van Hoose, or a person owing money to Mr. Van Hoose, the farm was kept in Pilgrim's Pride contracts – *without*, of course, the 'strong' policy regarding biosecurity. Additionally, by not enforcing the alleged regulations, and by not, for example, picking up the dead chickens out of the freezers (then owned by Mr. Nguyenlien). Pilgrim's Pride was violating this 'strong policy.'

81.   Plaintiffs labored at great expense to attempt to undo months or even years of *Pilgrim's Pride's and the other Defendants'* dereliction of their own duties, and when this effort was not done "quickly enough," it was used a partial justification for canceling contracts.   However, when a Pilgrim Pride official stood to gain, no issue was ever raised.   Meanwhile, when Pilgrim's Pride, the Bank, the title company, the appraisal company, and the persons associated stood to gain quick money in terms of down payments and capital investments the issue was raised.

82.   In other words, it would appear that every action taken by Pilgrim' Pride and the numerous person named herein were focused on two goals:   1). making

money for Pilgrim's Pride and others and  2). using fraudulent schemes to capitally improve a farm that Pilgrim's Pride considered "its own farm."  Upon information and belief, Pilgrim's Pride knew prior to entering into the contracts with Plaintiff Hiep Do that it never intended to perform under the contracts.

83.    This process of pushing Plaintiffs to improve the farm all the while intending to pull the contracts appeared orchestrated.  On September 10, 2004, a small note written by Pilgrim's Pride is sent to Plaintiffs complaining of a few issues. This is followed by a letter on October 11, 2004, complaining of a few minor maintenance issues, but ignoring the "freezer issues."  This note was sent after a visit was made by Mr. Randy Ward of Pilgrim's Pride.  Plaintiffs personally discussed the reasons cited above for the repair delay and the steps that were being taken to rectify the problem.  Randy Ward responded, "that's fine."

84.    On October 11, 2004, another letter was sent detailing several minor items.  For example, this letter noted eight minor items in "pullet houses" and 12 minor items in the "hen" houses.  The majority of these items represent day-to-day maintenance items.  For example, the report mentioned that some doors were open or missing.  Bear in mind, a door on some of these farms are a plasticized fabric sheet that simply can be affixed over the opening, or the door can be simply closed.  In any case, every one of these items was repaired or addressed.

85.    On October the 13, 2004, Pilgrim's Pride cancelled some of the contracts with Plaintiff Hiep Do.  As detailed above, virtually every issue raised by Pilgrim's Pride was addressed prior to canceling the contracts with Mr. Do.  For example, regarding Timberlake #3, addressed in a letter sent by John Holloway with Pilgrim's Pride, the letter cites three action items.[29]   Additionally, the letter mentions the freezers.  First, all three of these items were in fact addressed or repaired by Plaintiffs.  Prior to the cancellations, the only exception was the "clips" for which Plaintiffs were using an acceptable alternative according to Randy Ward.[30] Regarding the dead bird freezers, by this time half of the freezers were now working, the rest were being worked on and a new incinerator had arrived and was waiting to be hooked up to fuel.[31]   In spite of this, and in spite of the apparently thin justification, the contracts were pulled.

86.    However, in an almost schizophrenic about face, another inspection was had by Pilgrim's Pride and in the October 27, 2004 memorial letter, it was noted that the road was being fixed, and that it "appeared that proper biosecurity procedures were being followed."  Additionally, the letter noted the efforts to properly maintain the farm.  The letter then discussed several minor maintenance issues.  Assuming this was true, this demonstrates that Plaintiffs were likely the first farmers in months or

---

[29] Space heaters, door repair and chick removal clips.
[30] Randy Ward inspected the houses and expressed concern for the lack of 'clips,' a conversation ensued whereby the Plaintiffs explained the alternative equipment being used.  Randy Ward accepted the explanation and stated that this alternative was fine.
[31] This was temporally limited by the utility companies schedule.

even years to follow procedures and make improvements.  No mention was made of the "freezers."  As usual, all of the minor repair items were addressed.  On December 15, 2004, another letter was sent that referred to "service reports."  Numerous minor items were listed.  The letter states "most of these items have been repeatedly raised."  This letter also intimates that Farmers State Bank took an active role in this inspection and discussion of Plaintiffs' responsibility to Pilgrim's Pride.

87.    As discussed previously – most of the items are maintenance items that arise from time to time.  This is not to say that they should not have been addressed, but rather that they are items that slide out of repair and require repeated maintenance because the nature of the business is not static.[32] The Plaintiffs once again aver that because these items were occasionally identified as being out of repair does not mean that they were never repaired, or were not ever maintained as Defendants have spuriously alleged.  In fact, as discussed infra and supra – after the farm was "taken over," Pilgrim's Pride did exactly the same things and operated the farm without observing these same directives.

88.    Another of these allegedly dissatisfactory inspections was conducted on January 10, 2005.  In further continuation of this schizophrenic behavior by Pilgrim's Pride, on January 12, 2005, a new Pilgrim's Pride contract that was given to and

---

[32] Chickens are live creatures that will move items, move wires, and barriers as part of their natural behavior.  All that is required is to put these items back.  Making a snapshot observation that certain things are from time to time out of place does not prove mismanagement.

signed by Plaintiff Hiep Do.  Bizarrely, on January 14, 2005, the entire relationship between Hiep Do and Pilgrim's Pride was canceled claiming (1) that several items were not ready for the forth coming flock (which is inaccurate) and (2) gross negligence.  These claims were made in spite of the previous admission that things were being repaired, the fact that Plaintiffs invested tens of thousands of dollars in the farm, **and in spite of the fact that just two days prior to all of the contracts being cancelled, new contracts had been given and signed**.

89.    Plaintiffs affirmatively aver that every single letter described above was mailed by U.S. postal mail, return receipt requested.  Plaintiffs are in possession of each letter along with delivery receipts.

90.    At some point, upon information and belief, either because Pilgrim's Pride came to believe that Plaintiffs would not contribute enough capital improvement, or not producing those repairs quickly enough, Pilgrim's Pride canceled the contracts, and "took the farm over."  Not only did Plaintiffs make all of the required repairs within the time necessary, after the farm was "taken over," Plaintiffs video taped Pilgrim's Pride doing exactly the same thing it claimed was justification for canceling the contracts.  Further, on March 16, 2005, Pilgrim's Pride met apparently to have a planning meeting in order to facilitate the final chapter in the conspiracy, at least as it regards Plaintiffs.

### Brazen Behavior: Pilgrim's Pride memorializes the conspiracy in the form of "meeting minutes."

91.     On March 16, 2005, a number of conspirators including representatives of Pilgrim's Pride *and the Bank* met to discuss what Pilgrim's Pride wished to do with *Plaintiffs'* farm.  Pilgrim's Pride documented the minutes of this meeting.  An excerpt of this meeting discuses that:

> "**A meeting was held…at Pilgrim's Pride's offices in Center Texas…*Pilgrim's Pride considered* several scenarios relating to the future of Timberlake Farms.  *Based on Pilgrim's Pride's consideration* of the available options, … *the company prefers* that the Farm be split into two separate farms that will be used solely to raise broilers … however, the Company prefers that the prospective growers be new growers…additionally, before Pilgrim's Pride will enter into new contracts, *all houses on each respective farm must be retrofitted to Pilgrim's Pride's tunnel house specifications*…**" (emphasis added)

92.     This document is remarkable, bearing in mind that this is Plaintiffs' farm being discussed.  Pilgrim's Pride and Farmers State Bank were laying out plans on how Plaintiffs' farm should be split up and that other "new" farmer should now be attracted to further retrofit and capitally improve the farm.  The letter additionally states, "the Bank agreed[33]" that Pilgrim's Pride was 'justified' in taking over the farm.  Additionally, in discussing[34] the matter with Farmers State Bank, they stated that Pilgrim's Pride had admitted that it no longer wished to operate the farm to raise the same type of chickens that that Plaintiffs raised, and that further the farm would

---

[33] "did not question"

[34] This was discussed at a meeting held at Farmers State Bank, October 12, 2005.  The meeting was between Farmers State Bank, the Bank's Counsel, Counsel for Plaintiffs and Plaintiff Hiep Do.  The president of Farmers State Bank, Luke Motley, III stated that Pilgrim's Pride had told him this.

now require an additional 2.1 million dollars in further capital improvement.  **This remarkable admission described Pilgrim's Pride true reason for 'getting rid of' Plaintiffs**.

93.    It was obvious to Pilgrim's Pride that the recently canceled contracts with Plaintiffs and the apparent inability of Plaintiffs to pour any more money into the farm was not in line with Pilgrim's Pride's long term goals.  As such, Plaintiffs could simply be discarded.  It cannot be overstated, Pilgrim's Pride uses these farmers, as it has used Plaintiffs, to capitally improve what it considers to be Pilgrim's Pride's farm.  To do so costs them nothing and possibly increases Pilgrim's Pride's profitability the farm.  After all, if the future farmer does not react appropriately to the crack of the whip, another set of farmer can be similarly hustled. The language above meeting minutes pretty much says it all:  based on "Pilgrim's Pride's consideration."  Pilgrim's Pride is wiling to discard a farmer that has spent hundreds of thousand of dollars to continue Pilgrim's Pride unwavering focus on profit and lack of "consideration" for the rights of others.

## VII. Causes of Action

## A.  RICO

### 1.  General Allegations

94.    Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

95.   Defendants' have engaged in a scheme to defraud and later extort money in the form of down payments for a farm and later for costs associated with capital improvements of said farm and turning a profit for Pilgrim's Pride's chicken business. This scheme involves persons within Pilgrim's Pride and persons without, including, but not limited to Farmers State Bank and other named and unnamed persons associated with the land transaction and poultry contracts.  As described above, the value of the farm was arbitrarily increased in order to garner a larger deposit to increase the loan obligation and in order to help ensure that the loan would later fail when the rest of the fraudulent scheme was put into place.

96.   As described above, the remainder of the scheme included the pretextual and "trumped up" charges of improper farm management criteria and/or repair schedules.  Plaintiffs aver that their cause of action as it regards RICO is, if anything, exactly the sort of behavior that RICO seeks to address and prevent.  After all, RICO was originally designed to affect *organized crime.*  As described herein, this is an organized group of conspirators whose chief design is to attract would be investors, misrepresent the value of the investment and then engage in a scheme that ensures a swift, cost free capital improvement, low cost operations, and subsequent contract default.  Thereafter, the scheme is repeated.

97.   For example, and hypothetically within the organized crime model, suppose that a criminal organization is attempting to extort money from a small

business.  They demand payment of a portion of the business revenue or face having their business burned to the ground.  Suppose further, a couple of notes are sent or phone calls are made reminding this business to hand their money over or face destruction.  This situation would be precisely addressable by RICO *because the underlying action is criminal*.

98.     This sort of behavior almost exactly describes what has happened to Plaintiffs.  Plaintiffs were lured into the transaction by misrepresentations of land value and profitability by the Defendants.  After the transaction began, Pilgrim's Pride then in essence said: "Because you are obligated to pay the note on the farm, you will do every single repair and capital improvement to the farm that we demand, you will do so on the schedule we demand, or else your contracts will be immediately canceled."

99.     In other words, "we [the Defendants] demand payment now, or we [the Defendants] will destroy your (investment)."  Assuming this description is true, the Plaintiffs proffer the following question, how does Plaintiffs' circumstance differ from the hypothetical described in the paragraph above?  Are the actions described criminal and reprehensible?  The answers to these questions are yes.  There is no difference; these are criminal actions of fraud and extortion by the Defendants.

100.    Therefore, the Plaintiffs contend that the Defendants committed racketeering activities by engaging in mail and wire fraud, in violation of 18 U.S.C.

§§ 1341 and 1343; and extortion, in violation of 18 U.S.C. §§ 1951(a) and (b)(20).[35]

To violate RICO, a Defendant must engage in a pattern of racketeering activities.

RICO designates the violation of certain federal criminal laws as "racketeering

activities." *See* 18 U.S.C. § 1961 (1).

101.   Defendants violated the Racketeer Influenced and Corrupt Organizations

Act in connection with a scheme devised, conducted, and/or participated in by

Defendants in conjunction with third party persons both named and unnamed,

including but not limited to Pilgrim's Pride, Farmers State Bank, Alexander

Hungngoc Nguyenlien, Truong Truong, Louis Truong, Adam Truong, Alex Truong,

Brimhall Appraisal Services and Professional Title Services, through a pattern of

racketeering activity.[36]   Defendants conducted, or participated directly or indirectly in

conduct of, the affairs of an association-in-fact enterprise (hereinafter referred to as

---

[35] "travel in interstate or foreign commerce or use the mail or any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."

[36] 18 U.S.C. § 1961(1) defines "racketeering activity" to include violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. 1952 (extortion under the Hobbs Act), as more fully explained herein, Defendants committed both mail fraud and wire fraud in furtherance of a fraudulent scheme.  As described below, Plaintiffs further allege that Defendants engaged in a "pattern" of racketeering activity in that they committed "at least two acts of... [mail fraud or wire fraud or extortion] ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

the "Enterprise"), associating with themselves as well as unnamed parties. Defendants are "persons" with in the meaning of 18 U.S.C. 1961 (3).[37]

102.   Defendants violated 18 U.S.C. 1951[38] by *extorting* money from the Plaintiffs by threatening to cancel the contracts responsible for both the livelihood of the Plaintiffs and for servicing the inflated financial obligation they had incurred on behalf of Pilgrim's Pride.  The result of this scheme was that the Defendants, named and unnamed conspirators, conspired to and did knowingly, wrongfully, and unlawfully, inflate the value of said property, misrepresent the profitability of the contracts by failing to adequately represent the nature and costs associated with improvement, and did then extort capital costs from the Plaintiffs through threats of economic ruin, all to the benefit and financial gain of Defendants, and to the detriment of Plaintiffs.  Further, the Defendants wrongfully used the fear of economic loss to convince Plaintiffs to expedite the repair and capital improvement of said farm, or face the destruction of Plaintiffs' investment.

---

[37] A "person" includes any individual or entity capable of holding a legal or beneficial interest in property.

[38] Under the Hobbs Act, 18 U.S.C. § 1951, "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2).  The "fear" may be of *economic loss* as well as of physical harm.  *See United States v. Cusmano,* 659 F.2d 714 (6th Cir. 1981)*; United States v. Forszt,* 655 F.2d 101 (7th Cir. 1981); *United States v. Gerald,* 624 F.2d 1291 (5th Cir. 1980), cert. denied*,* 450 U.S. 920, 67 L. Ed. 2d 348, 101 S. Ct. 1369 (1981).

103.   In carrying out the scheme to defraud Plaintiffs, Defendants engaged, *inter alia*, in conduct in violation of federal laws, to wit: mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343, violation of the Travel Act, 18 U.S.C. § 1952(a)(3), and violation of the Hobbs Act 18 U.S.C. 1951.

104.   Because of the above, Defendants violated, 18 U.S.C. § 1962 (a),[39] 18 U.S.C. § 1962 (c),[40] and 18 U.S.C. § 1962(d).[41]

## 2. Pattern of Unlawful Racketeering Activity

105.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

106.   Defendants have engaged in and continue to engage in a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5), by committing and/or conspiring to commit a scheme consisting of at least two related predicate acts of racketeering activity, as described in detail below, within the past ten years.

---

[39]  18 U.S.C. § 1962 (a) states: It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

[40] 18 U.S.C. § 1962(c) states:  It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

[41] 18 U.S.C. § 1962(d) states: It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

107.   The multiple acts of racketeering activity committed and/or conspired in by Defendants were related to each other and amount to, and pose a threat of, continued racketeering activity, and therefore constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

108.   During the relevant time period, Defendants, along with (other persons), knowingly, wrongfully, and defrauded Plaintiffs regarding the land transaction, and extorted money regarding capital improvements to the farm, all to the benefit and financial gain of Defendants and to the detriment of Plaintiffs.

109.   This scheme to defraud Plaintiffs evolved over time as a pattern of racketeering activities that inflicted discrete harms to the Plaintiffs.  Plaintiffs were the victims of these unlawful patterns of racketeering activity because it suffered discrete financial losses as a direct and proximate result of Defendants' activities.

110.   In carrying out the scheme to defraud the Plaintiffs, Defendants engaged, inter alia, in conduct in violation of federal laws, to wit: mail fraud, in violations of 18 U.S.C. § 1341, wire fraud, in violation of 18 U.S.C. § 1343, extortion, in violation of 18 U.S.C. § 1951, and the Travel Act, 18 U.S.C. § 1952(a)(3).

111.   Although, upon information and belief, numerous occasions of such fraud and violations of federal law have occurred, the following predicate acts are

given as uses of the mail, wire and, possibly travel related services, in furtherance of the fraudulent pattern and scheme:

(a)    Plaintiffs hereby incorporate the general description of acts in paragraphs above.

(b)    The placement of the initial advertisement and continued solicitations regarding the sale of the farm, made by Alexander Hungngoc Nguyenlien and the Truongs, via the mail and wires;

(c)    The appraisal of said farm was commissioned and produced via the use of the mail and wire service;

(d)    Communication between the parties in order to coordinate meetings in furtherance of the conspiracy was accomplished, upon information and belief via the telephone, email, fax or mail;

(e)    Plaintiffs aver that they have had numerous communications where misrepresentations were made regarding the overall transaction.   These conversations were with members of the Truong family, an executive of Pilgrim's Pride, and Farmers State Bank, and these conversations occurred on or about the two-month period preceding the purchase of the farm.   Additionally, fraudulent and pretextual misrepresentations continued until after the sale of the farm.   These

communications were often in follow-up to previous communications and occurred by both telephone and fax; and

(f)     Additionally,   several letters were mailed to Plaintiffs, which communicated the application of improper and fraudulent farm management criteria and/or repair schedules in order to damage the Plaintiffs.   These letters sought to simultaneously extort money, as well as produced feigned justification to cancel the contracts, which was intended all along.[42]

### 3.  Enterprise and Scheme

112.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

113.   Through its advertising, communications and representations to Plaintiffs, Defendants consistently represented that it would enter into a long term, profitable relationship with Plaintiffs.   The profitability of the farm was misrepresented at least in terms of the offset cost of capital improvement. Additionally, insofar as the Pilgrim's Pride had a design and scheme to break the contracts prematurely, the fact of the matter is the entire representation of *any* profitability was a fraudulent ruse.

---

[42] These letters include, the 9/13/94 Randy Ward letter, 10/11/04 Cecil Jackson letter, the letters describing contract removed on 10/13/04 (two letters both from Holloway), 10/27/04 John Holloway, 12/15/04 John Holloway, and the letters dated 1/10/05 and 1/14/05.

114.   The initial advertisement for the farm was procured, upon information and belief, via the use of either the mail or wire services and further, addition communication with Plaintiffs were accomplished, in addition to oral representations, via the use of mail or wire services.

115.   As described above, several inspections were accomplished regarding the farm.  These inspections, to the extent these inspections observed *any material violations whatsoever*, were a misuse of routine complaints in order to extort continued capital improvement.  Plaintiffs aver that the purpose of the memoranda/letters described above served a dual purpose.  First, the communications were expressly designed to extort money.   Second, the communications were designed to develop a "paper trail" to feign justification for breaking the contracts.  This tortious, fraudulent behavior was accomplished via the U.S. mail in violation to 18 U.S.C. § 1341, and was done as part of a larger conspiracy to destroy Plaintiffs' business and/or place Plaintiffs in fear of economic loss via inherently wrongful behavior.

116.   As facilitated by the above-mentioned mail and wire communications and representations, Defendants have engaged in unlawful practices designed to extort money and destroy Plaintiffs' investment.

117.   These combined events were done with the purpose of forcing Plaintiffs to increase the pace of capital improvement or in the alternative make other

improvements or face the destruction of Plaintiffs' investment. Once again, this behavior is analogous to the hypothetical described in the paragraph supra. This extortion is within the ambit of the Hobbs Act.[43] Additionally, in order to effectuate this scheme, Defendants participated in and engaged in the affairs of the "Enterprise."

118. The "Enterprise" is an *association-in-fact* enterprise comprised of the following entities and/or persons: Pilgrim's Pride, Farmers State Bank, Alexander Hungngoc Nguyenlien, Truong Truong, Louis Truong a.k.a. Luan Truong, Alan Truong, Adam Truong, Professional Title Services, Inc., Brimhall Appraisal Services, and the other named and unnamed co-conspirators.

119. Through the affairs of the "Enterprise," Defendants were and are able to manipulate and control the repair and/or improvement of a farm that Pilgrim's Pride regarded as its own. This scheme, as described in more detail above and below, was and is accomplished via written agreements, associations, and the sharing of information between Defendants. Through the "Enterprise," Defendants and the named and unnamed parties were and are able to conceal their scheme.

120. As a result of the scheme, Defendants have received and continue to receive a direct benefit and financial gain, all to the detriment of Plaintiffs. In fact,

---

[43] *See Grider v. Keystone Health Plan Cent., Inc.*, 2003 U.S. Dist. LEXIS 16551, 2003 WL 22182905 (E.D. Pa. Sept. 18, 2003). Under the Hobbs Act, 18 U.S.C. § 1951, "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). The "fear" may be of economic loss as well as of physical harm. *See United States v. Addonizio*, 451 F.2d 49, 72 (3rd Cir. 1972).

Pilgrim's Pride "took over" the farm and nefariously conspired to "divide up" said farm for the benefit of Pilgrim's Pride. In addition, on November 1, 2005, Farmers State Bank foreclosed on Timberlake Farm stripping the Plaintiffs' of their equity interest in the farm.

121. Defendants' employees are in positions of authority, influence, and control over Plaintiffs' business and applied improper and fraudulent farm management criteria and/or repair schedules in order to damage to extort money and damage Plaintiffs' business.

122. On information and belief, in order to conceal the scheme from Plaintiffs, Defendants agreed, via mail and wire communications, not to disclose to Plaintiffs the nature of the scheme, until the scheme had drawn to what Pilgrim's Pride regarded the end-game of the conspiracy. The scheme was then revealed in the meeting described above wherein Pilgrim's Pride determined to divide Plaintiffs' farm in order to restart the scheme anew, albeit against new victims.

123. The result of this of the scheme is that Plaintiffs expended $336,500.00 in down payment costs, approximately $100,000 in repair and capital improvement, and hundreds of hours of sweat equity. Further, Plaintiffs have lost the prospect of future profits for said farm and other associated business ventures. Defendants themselves provided and affirmed earnings data that projected future profits for the purpose of inducing Plaintiffs into 'investing' in this venture. To the extent the

Defendants wish to argue that the farm was un-established business for the Plaintiffs, the Plaintiffs counter-aver that the business had been an ongoing venture with an at least *represented* track record of profits.   As such, these prospective profits can be projected into the future by using the Defendants figures.   **To the extent that the Defendants argue that future profits are speculative, they would be simultaneously arguing that Plaintiffs were fraudulently induced into the contracts by representations of past profit**.

124.   The standard fraudulent practice that is at the heart of this RICO conspiracy is this:   Pilgrim's Pride engages its own employees as well as other organizations, not limited to the other named Defendants, to attract "investors" in the chicken business.   This scheme simultaneously fulfills several goals for Pilgrim's Pride.   The farms that Pilgrim's Pride utilizes require no investment on its behalf. The farms go through continuous capital improvement, at no cost to Pilgrim's Pride. The company continues to have its chicken raised, even if it means that it, from time to time, shifts its assets (in the form of live chickens) from farm to farm in order to either extort more money out of an "owner" or feign justification for canceling a contract so that it can begin this nefarious process anew.

125.   Additionally, upon information and belief, in order to ensure that the scheme was completed, Defendants instituted a program providing incentives to its co-conspirators.   By engaging others in assisting in the scheme to cause Plaintiffs'

farm contracts to fail, *the conspirators provide for an opportunity for the scheme to be repeated*.  This incentive is communicated, upon information and belief, to the Defendants via wire and mail communications.

126.   As a result of the above agreements and associations, Defendants received and continue to receive a direct benefit and financial gain.

127.   Defendants receive a direct benefit and financial gain because of their associations and agreements when Plaintiffs deposits money or improves the farm. Accordingly, the more often Defendants apply the improper and fraudulent farm management criteria and/or repair schedule, the Defendants benefit by either receiving immediate benefit or ensuring future failure and perpetuating the scheme.

128.   As a direct and proximate result of the above-referenced associations between Defendants, both named and unnamed, were engaged to inflate the value and return on an investment, and to apply the improper and fraudulent farm management criteria and/or repair schedules in order to damage Plaintiffs, until Plaintiffs were incapable of investing any more money or time. This was done until a pretextual justification for canceling the contracts was obtained, all to the harm of Plaintiffs and all to the benefit of Defendants.

### 4.  <u>Violation of 18 U.S.C. §  1962(c)</u>

129.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

130.   Pilgrim's Pride is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

131.   Other named Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

132.   Unnamed Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

133.   At all times relevant herein, the Enterprise was and is an "association-in-fact enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), and said Enterprise was and is engaged in activities that affect interstate commerce.

134.   Defendants were and are associated with said Enterprise and conducted or participated, directly or indirectly, in conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1962(c): to wit, multiple instances of mail fraud, in violation of 18 U.S.C. § 1341, multiple instances of wire fraud, in violation of 18 U.S.C. § 1343, and violations of the Hobbs Act, 18 U.S.C. 1951.

135.   Although Defendants directly participated in the Enterprise, Defendants also have an existence separate and distinct from the Enterprise.

136.   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs were injured in Plaintiffs business and/or property in a yet to be fully determined amount, all within the meaning of 18 U.S.C. § 1964 (a) and (c).

### 5.   Violation of 18 U.S.C. §  1962(d)

137.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

138.   Pilgrim's Pride is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

139.   Other named Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

140.   Unnamed Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

141.   At all times relevant herein, the Enterprise was and is an "association-in-fact enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which Enterprise was and is engaged in activities affecting interstate commerce.

142.   Defendants were and are associated with said Enterprise and conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).

Specifically, Defendants conspired to conduct or participate, directly or indirectly, in the conduct and affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1)(B) and 1962(c), to wit, multiple instances of mail fraud, in violation of 18 U.S.C. § 1341, multiple instances of wire fraud, in violation of 18 U.S.C. § 1343, the Hobbs Act, 18 U.S.C. 1951, and the Travel Act 18 U.S.C. § 1952(a)(3).

143.   Although Defendants directly participated in the Enterprise and are a part of same, Defendants also have an existence separate and distinct from the Enterprise.   Specifically, the enterprise described supra that sought to damage Plaintiffs.

### 6.  Defendants' Actions Affect Interstate Commerce

144.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

145.   Plaintiffs state that the poultry industry and the Defendants' underlying criminal behavior affect commerce.   However, Plaintiffs aver that since the RICO claim is based upon violations of <u>federal</u> criminal statutes, the commission of the underlying federal crime necessarily establishes (*See* 18 U.S.C. § 1961(1)(B)) the nexus with interstate commerce.   Moreover, because the U.S. Constitution confers the

postal powers upon the federal government, acts of mail fraud, even intrastate use of the mails, have an inherent nexus with interstate commerce.

146.    Chicken is consumed in every state of the United States.    Poultry is raised in numerous states and is shipped, intrastate, interstate and overseas for sale and consumption.    The poultry industry, as a multi-billion dollar industry, affects commerce and, as such, is within regulatory powers of the U.S. Congress.

147.    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(d), Plaintiffs were injured in its business and/or property in an amount yet to be determined within the meaning of 18 U.S.C. § 1964(c).  Plaintiffs believe that after a reasonable opportunity for further investigation or discovery, additional relevant evidence may further support this claim.

## B.  Fraud, Constructive Fraud, and Fraud in the Inducement

"'**Where a person obtains money of another by compulsion, extortion, oppression or fraud, an action had and received will lie to recover it**.'"[44]

148.    Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

149.  From  the  beginning  and  during  the  continuance  of  the  parties' relationship, Pilgrim's Pride and the other Defendants made numerous false and material  misrepresentations  to  Plaintiffs  and  others  with  the  intent  that  these

---

[44] 4 Am.Jur. p. 513, § 23.

misrepresentations be relied upon by Plaintiffs.   As used herein, the term "misrepresentations" includes, but is not limited to, omissions whereby Pilgrim's Pride and the other Defendants failed to disclose relevant and material facts to Plaintiffs so as to deprive Plaintiffs of a full, complete, fair, and accurate picture of the facts and circumstances relating to the parties' relationship and the contracts.  The misrepresentations began before the consummation of the contractual relationship between Defendants and Plaintiffs, and continued throughout the term of the parties' relationship.

150.   These misrepresentations made to Plaintiffs by Pilgrim's Pride and the other Defendants include, but are not limited to, the following: (a) misrepresentations that Pilgrim's Pride and the other Defendants intended to fulfill their obligations and/or promises regarding profitability and/or the costs and schedule associated with repair, capital improvements, and purchase of the farm,[45] (b) misrepresentations to Plaintiffs regarding the nature and amount of work that would be given to Plaintiffs; (c) misrepresentations that Plaintiffs would have a long term contractual relationship with Pilgrims Pride and the other Defendants; (d) misrepresentations to Plaintiffs that Pilgrim's Pride and the other Defendants intended to perform under the contracts; (e) failure to disclose that, prior to the execution of the contracts, Pilgrim's Pride and the

---

[45] All of the Defendants have placed themselves in the strange predicament of having to show that either, no warnings about the previous owner's contract behavior and farm maintenance were given, and therefore the behavior towards Plaintiffs was pretextual, or warnings were in fact routinely given and that this information, to include the threats of closing the farm, was materially omitted, and as such Plaintiffs were fraudulently induced into the contract.

other Defendants had formed an intention not to perform thereunder; (f) misrepresentations and/or guarantees that Plaintiffs would earn a substantial minimum annual revenue and profit under the contracts and/or in connection with other business promised to Plaintiffs; (g) misrepresentations that the parties business relationship would be a continuing business relationship; (h) misrepresentations that Plaintiffs would benefit from working with/for Pilgrim's Pride; (i) failure to disclose to Plaintiffs that when Pilgrim's Pride and the other Defendants were negotiating with Plaintiffs on the contracts, Pilgrim's Pride and the other Defendants had already made a decision to terminate the contracts and were actively planning to negotiate with other entities to have those entities replace Plaintiffs; and (j) failure to disclose to Plaintiffs, before the fact, that Pilgrim's Pride and other Defendants had decided that the farm was to be retro-fitted or converted and would require millions of dollars in capital investment.

151.   These misrepresentations were made by Pilgrim's Pride and the other Defendants to Plaintiffs, *inter alia*, to induce Plaintiffs to enter into the contracts, to invest heavily in said farm and/or to refrain from taking actions to protect and enforce their legal rights.[46]   Plaintiffs relied upon these material misrepresentations by

---

[46] In Texas, "[a] fraud cause of action requires 'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.'" *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors*, 960 S.W.2d 41, 47 (Tex. 1998). "A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." *Formosa Plastics*, 960 S.W.2d at 48.

Pilgrim's Pride and the other Defendants, and commenced working on the performance of these Contracts to the exclusion of virtually all other work.  Plaintiffs hereby sue Defendant Pilgrim's Pride and the other Defendants for actual fraud, constructive fraud, and fraud in the inducement.

152.   As a result of these acts, misrepresentations, and omissions of Defendant Pilgrim's Pride and the other Defendants, Plaintiffs have suffered substantial actual damages, including, but not limited to, reliance damages, the loss of the benefit of its bargain with Pilgrim's Pride, and other costs associated with the behavior the other Defendants, not limited to loss of deposits and payment for fraudulently inflated land, and the loss of profits and/or gross revenues to be earned pursuant to the Contracts and/or its business relationship with Pilgrim's Pride and the other Defendants. Plaintiffs seek such actual damages against Defendant Pilgrim's Pride and the other Defendant together with punitive damages, pre-judgment and post-judgment interest, attorneys' fees, and all other relief available under applicable law.

(i)   Pilgrim's Pride:   Misrepresentations by Pilgrim's Pride regarding the condition, value and profitability of the farm.   Before the transaction, the fact that the farm was "on the verge of being shut down" was hidden and was divulged only after the contracts were executed.   There were further misrepresentations regarding the magnitude of cost of improvements and regarding the schedule for production of said capital improvements on a flexible standard.   Additionally, Pilgrim's Pride failed to

disclose to Plaintiffs, before the fact, that Pilgrim's Pride and other Defendants had decided that the farm was to be retro-fitted or converted and would require millions of dollars in capital investment.

(ii)   Farmers State Bank:   Farmers State Bank was engaged as more than a conduit for purchase money.   The evidence thus far indicates that the Bank was integrally involved in the conspiracy to defraud Plaintiffs.   First, Pilgrim's Pride would not allow financing by any other institution.   This alone reeks of self-dealing and conspiracy.   Further, the Bank arranged for an "independent" appraisal, but that appraisal was apparently inflated as demonstrated by the events that unfolded after the transaction was completed.   Further, the Bank was involved in the "management" of the farm.   Often, Mr. Greg McCoury of Farmers State Bank would schedule and attend "inspections" of the farm and actively participate in pointing out to Plaintiffs the alleged problems with the day-to-day management of the farm.   To the extent the Bank argues that this was an attempt to protect the loan, Plaintiffs aver that the Bank had a great deal to gain in 'turning the farm around.'   After all, turning the farm around means fresh set of deposits, etc. as well as interest and the opportunity to "acquire" the farm for pennies on the dollar.   In fact, the Bank – even though no foreclosure action had occurred -- played an active role in the planning meeting described above where Pilgrim's Pride conspires to "divide up" the farm.

Consequently, Farmers State Bank's services were more than just a loan provider; they were an active facilitator of this fraudulent transaction.

(iii)  Alexander Hungngoc Nguyenlien, Troung Troung, Louis Truong, Adam Truong and Alan Truong all misrepresented the value of, the profitability of and the state of repair of the farm (or rather disrepair of the farm).   Further, there is some indication that either the farm was being mismanaged before Hiep Do purchased the farm.   A farm that is on the verge of being shut down (to the extent that is true) and that required hundreds of thousands of dollars in repairs, up-grades, maintenance, could not be adequately described as "fine" and everything works well.   Therefore, these Defendants made material misrepresentations and omission for the purpose of fraudulently inducing Plaintiffs into the contracts.

(iv)  William C. Brimhall d.b.a. Brimhall Appraisal Services was engaged exclusively by Farmers State Bank.   Plaintiffs had no say in this.   Farmers State Bank was insisted on by Pilgrim's Pride.   Upon information and belief, Brimhall did the last appraisal or appraisals of Timberlake Farm.   Although there are disclaimers of repairs or upgrades that will need to be made to the farm, and even though the value of these repairs exceeds $100,000.00, the actual value of the farm increased by over $300,000.00.   This increase was made in spite of the strong evidence that the farm was left in disrepair.   While there are disclaimers that the value of the farm would be altered by not improving or repairing the farm, the improvement estimates that were

available to Brimhall are far below the increase in value listed by him.  Further, the value of the farm was made on estimates of profitability.  Brimhall's profitability estimates do not seem to take into consideration the costs associated with the massive improvement effort demanded by Pilgrim's Pride, the tyrannical pace of such improvement, and the constant threat of contract termination based in part on this schedule.  Mr. Brimhall stood to gain in inflating the price:  doing so ensures his continued referral business and contributes to the deficiency amount in the even of default.  Said deficiency enriches the Bank.  Further, it also assists in qualifying a buyer who is in turn used by Pilgrim's Pride to capitally improve the farm.

(v)   During the sale of Timberlake Farm and the signing of the poultry contracts, Professional Title Services assisted the Truongs, Pilgrim's Pride and Farmers State Bank in furthering their fraud conspiracy against the Plaintiffs. Although the poultry contracts and land sale documents were signed by the parties (both for the production of chickens and for the sale of the farm) no copies were provided to Plaintiffs.  It was only later that copies were provided, some signed, some unsigned and some, upon information and belief, containing certain clauses were not included as attachments to the contracts presented during signing and closing.[47]

---

[47] Later, when Plaintiffs approached the title office owned by Ken Muckelroy, the title office refused to give a *complete* copy of the contract and other documents filed with the title office during closing.  The reasons given for this are unclear. Later, it was curiously noticed that a letter signed by Truong Truong, agent for Mr. Alexander Hungngoc Nguyenlien (the farm seller), instructed Pilgrim to terminate its contracts and forward any bonus to Plaintiff Hiep Do, was written *on J. Ken Muckelroy's letter head*.  This alone indicates some relationship between the person representing

Additionally, J. Ken Muckelroy through Professional Title Services cooperated in this conspiracy.  Oddly, Mr. Muckelroy acted in this conspiracy as title officer and may have acted as counsel for the Defendant Farmers State Bank.  Mr. Muckelroy is well aware that a full and complete copy of the contracts should have been tendered to Plaintiffs at closing.   Further, Professional Title Services has refused to allow Plaintiff Hiep Do review his title file.  Additionally, after Plaintiff Hiep Do signed all of the documents, he heard that the farm was almost closed down because of the condition of the farm left by the Truongs.  As such, Mr. Do went to Professional Title Services to see if was possible to get out of the contracts and land sale.  The owner of Professional Title Services, J. Ken Muckelroy, told Mr. Do that the deal was done and he could not do so.

## C.  **Breach of Contract**

153.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

154.   Pilgrim's Pride breached its contracts with Plaintiffs.   Plaintiffs are entitled to recover attorneys' fees and costs from Defendants under Chapter 38 of the Tex. Civ. Prac. & Rem. Code and other applicable law.   Plaintiffs have taken no actions which would deprive them of their right to seek the redress sought hereunder

the seller, and the person who handled title matters for the sale, Mr. Muckelroy.  Suspiciously, there appeared to be multiple copies of the production contracts, some signed, some not singed, some with one type of 'attachment,' some with another, some with no attachment.  In fact, the copies that were given to Plaintiffs at the title office, which presumably were given to the title officer on the day of sale, had no attachment describing "disposal of dead birds."

from this Court.  All conditions precedent to Plaintiffs' recovery under the contracts have occurred.  Although the contracts were signed (both for the production of chickens and for the sale of the farm), no copies were provided to Plaintiffs.  It was only later that copies were provided, some signed, some unsigned and some, upon information and belief, containing certain clauses were not included as attachments to the contracts presented during signing and closing.   Further, Professional Title Services has refused to allow Plaintiff Hiep Do review his title file.  The few papers that were given demonstrate a discrepancy between what was given at closing (nothing), what was given to Plaintiffs later and what was (and is) contained in the title file.  These documents, as concocted as they would appear to be, are being used by Pilgrim's Pride against Plaintiffs.  Therefore, due to the fact that Plaintiffs only have what appear to be adulterated copies of any contracts, Plaintiffs are unable to attach true and correct copies of the contracts at this time.

155.  Pilgrim's Pride, in cooperation with other Defendants and those Defendants' representatives, have maintained that the ostensible basis for the termination of the contracts was a failure of Plaintiffs to perform pursuit to the terms thereof.  Specifically, Pilgrim's Pride and the other Defendants have alleged that Plaintiffs failed to consistently meet the guidelines for performance set forth contracts.   However, Plaintiffs would show that Pilgrim's Pride and the other Defendants, beginning before the commencement of and during the contractual

relationship between the parties, acted in furtherance of a plan to fabricate various pretexts to rely upon in breaching its various obligations to Plaintiffs.  To the extent allowed by Pilgrim's Pride and the other Defendants, Plaintiffs have fully performed all duties imposed upon it under the contracts.

156.   Further, as set forth above, if anything, Plaintiffs were in greater compliance with the "regulations" set forth by Pilgrim's Pride than the prior owners of Timberlake Farm.  Plaintiffs worked tirelessly not only to run the farm, but also to cure *Pilgrim's Pride's failures* as well as the failures of the previous owner.  In spite of this, Pilgrim's Pride has concocted a pretext based on items that were performed in manner that is identical to or superior to the performance of the predecessor and equivalent or superior to Pilgrim's Pride itself after the termination of said contracts and taking over the farm.

157.   Pilgrim's Pride and the other Defendants further acted to prevent the smooth coordination of work between the parties and Plaintiffs' performance under the contracts.  In addition, Pilgrim's Pride and the other Defendants misrepresented to or withheld from Plaintiffs significant information.  Ironically, the performance of Plaintiffs that Pilgrim's Pride and the other Defendants claimed to be substandard was precisely the same level and quality of performance that Pilgrim's Pride and the other Defendants had itself previously allowed and continued to perform after the termination of the contracts and taking over the farm.

158.   It must be repeated that the services provided by Plaintiffs under the contracts, were the same type of services that had been previously performed by the previous owners, and by Pilgrim's Pride after the contracts were "taken over."  The actions taken by Pilgrim's Pride and the other Defendants were taken with the specific purpose of creating a pretextual breach of contract in order to destroy the ongoing business of Plaintiffs and deprive Plaintiffs of the revenues, profits, and benefits to accrue to Plaintiffs under the contracts and/or to obtain capital improvement, which in turn would increase production and Defendants' profits on the farm.

159.   Furthermore, Pilgrim's Pride, to the extent that it relies on pre-contractual representations that it made regarding the nature of repairs and improvements, are reminded that the contracts that Pilgrim's Pride drafted contain a merger clauses that "integrate" the contracts.   Further, because Pilgrim's Pride apparently planned to ultimately cancel the contracts and re-take the farm, Pilgrim's Pride is estopped from relying on said merger clause for protection.  Fraud cannot be merged into a contract.[48]   Therefore, the "breaches" by Plaintiffs claimed by

---

[48] When a contract has been induced by fraud, the merger clause contained within a contract does not demonstrate the totality of the agreement. To the extent that Pilgrim's Pride argues that the merger clause bars pre-contractual misrepresentation, which is the subject of this action, and that the contract contains a merger clause that bars this action because it, in essence, integrates the contract.  However, a merger clause does not guarantee merger. *Bob Robertson, Inc. v. Webster*, 679 S.W.2d 683, 688-89 (Tex. App.--Houston [1st Dist.] 1984, no writ).   There are several exceptions to the merger clause. ***Fraud in the inducement is one of them***. *Dallas Farm Machinery Company v. Ben Reaves*, 307 S.W.2d 233; 158 Tex. 1, 25 (Tex. 1957).  *See also Pan Am. Bank v.*

Pilgrim's Pride and the other Defendants to form the basis for termination of the contracts were not material and thus were insufficient to constitute any default or breach by Plaintiffs.   Additionally and/or in the alternative, the guidelines for timeliness of performance set forth in the contracts, to the extent they exist at all, were unreasonable, arbitrary, unconscionable, ambiguous, without consideration, part of a scheme by Pilgrim's Pride and the other Defendants to cause Plaintiffs to fail in its performance of the contracts, and/or otherwise unenforceable.

160.   During the period the contracts were in force, Pilgrim's Pride and the other Defendants created numerous pretextual allegations of nonperformance and noncompliance with the terms of the contracts.   Pilgrim's Pride and the other Defendants' allegations of nonperformance or substandard performance by Plaintiffs were specious and part of a subterfuge concocted by Pilgrim's Pride and the other Defendants to provide an ostensible basis for the termination of the contracts and the

---

*Nowland*, 650 S.W.2d 879, 885 (Tex. App.--San Antonio 1983, writ ref'd n.r.e.) (disapproved of on other grounds by *Crimmins v. Lowry*, 691 S.W.2d 582 (Tex. 1985)); *Anderson v. Havins*, 595 S.W.2d 147, 153 (Tex. Civ. App.--Amarillo 1980, writ dism'd); *Beggs v. Texas Elec. Serv. Co.*, 396 S.W.2d 461, 463 (Tex. Civ. App.--Fort Worth 1965, writ ref'd n.r.e.).

The Texas Supreme Court in *Dallas Farm Machinery* in discussing mergers or releases held that "[a merger clause] is a common provision in written contracts that no other promises, representations or inducements were made than are contained in the writing." *Dallas Farm Machinery Co. v. Reaves*, 158 Tex. at 25. However, "…a merger clause can be avoided for antecedent fraud or fraud in its inducement and the parole evidence rule does not stand in the way of proof of such fraud…[because]…the merger clause is ineffectual to exclude evidence of extraneous prior or contemporaneous representations of either the principal or an agent to establish fraud by way of defense or in an action for rescission, as even if the principal is himself innocent, **he cannot be allowed to retain a benefit obtained by the fraud of his agent**." *Dallas Farm Machinery Co. v. Reaves*, 158 Tex. at 25-26 (emphasis added).

destruction of Plaintiffs' business.  Pilgrim's Pride and the other Defendants then utilized this subterfuge to carry out the termination of the contracts in violation of its very terms.

161.   Pilgrim's Pride and the other Defendants further disrupted the orderly and efficient business of Plaintiffs by constantly changing the priorities for the work that it wanted completed, thereby requiring Plaintiffs to stop work in progress and reconfigure its work schedule.  Pilgrim's Pride and the other Defendants also made repeated and unusual complaints for routine maintenance items, thereby requiring Plaintiffs to split his efforts between his normal daily production routine in order to satisfy the capricious requests of the Defendants.  Even if it could be argued that Plaintiffs to was behind with regard to their ongoing work, Pilgrim's Pride and the other Defendants caused any delay through its arbitrary and capricious request.  Then, Pilgrim's Pride used any such delay as a pretext for subsequent criticism.  In addition, Pilgrim's Pride and the other Defendants withheld material information from Plaintiffs that would have enhanced Plaintiffs' performance of the duties required under the contracts.  Defendants' breaches of said contracts have caused Plaintiffs extreme financial damages.

## D.  Economic Duress

162.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

163.   The Defendants employed economic duress to achieve capital improvement to a farm that was later taken through a conspiracy of the Farmers State Bank and Pilgrim's Pride.   As described above, the farm was purchased with understanding that the farm would require some 'repair and improvements.' However, the shear magnitude of the work, the speed with which its production would be required and the fact that the Plaintiffs as the new owner would be impressed into such service under the threat of financial ruin, was withheld.   In addition to a $336,500.00 initial investment, Plaintiffs were required to invest more than $100,000 in repairs and up-grades under the constant threat of financial ruin. This was done in spite of the fact that these sorts of drastic improvements and draconian scheduling were never required of the previous two owners.

164.   The Defendants used the threat of financial ruin to facilitate repair and replace equipment until it appeared to the Defendants that Plaintiffs had reached their investment limits.   When this occurred, the Defendants continued to carry out their conspiracy to ruin Plaintiffs financially and start the fraudulent process over again. Once again, Pilgrim's Pride, in conjunction with the other Defendants, used the transaction with Plaintiffs as an 'off-balance sheet' accounting scam, which maximized Pilgrim's Prides interest and profits, all to the detriment of Plaintiffs.   Due to Defendants' conduct, the contracts were cancelled and the Plaintiffs were damaged.

## E.  Unjust Enrichment

165.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

166.   Additionally and/or in the alternative, the Defendants have been unjustly enriched by their fraudulent actions.   Plaintiffs acknowledges that there was a contract, as limited by the fact that Pilgrim's Pride never intended to fulfill the contracts visciates its existence.   Further, Plaintiffs acknowledges that unjust enrichment is normally a derivative action within the doctrine of quasi contract.  However, the facts demonstrate that Defendant Pilgrims Pride never intended to fulfill the contracts and that the contracts were cancelled pretextually.   As such, Plaintiffs believe that unjust enrichment is applicable in the instant matter.[49]

167.   Plaintiffs aver that Pilgrim's Pride, as well as through the use of the services and through the use of fraudulent assistance by the other Defendants as described above, fraudulently induced Plaintiffs into (1) purchasing the Timberlake Farm and (2) entering into various contracts with Pilgrim's Pride.

---

[49] Unjust enrichment is a theory of recovery that applies when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage.  Unjust enrichment may take the form of the unjust retention of a benefit to the detriment of another person, or the unlawful retention of money or of other personal property belonging to another person   *SeeTri-State Chems., Inc. v. Western Organics, Inc*., 83 S.W.3d 189, 199 (Tex. App.--Amarillo 2002, pet. filed). Action for Unjust Enrichment is a type of quasi contract action. Quasi-contractual obligations are imposed by the courts for the purpose of bringing about a just result without reference to the intention of the parties. Thus, unjust enrichment does not result from a contract but is an obligation imposed by law to do justice even though it is clear that no promise was ever made or intended.  *See Fortune Production Co. v. Conoco, Inc*., 52 S.W.3d 671, 683-684 (Tex. 2000).

168.   As a result of the inducement, Plaintiffs invested hundreds of thousands of dollars and became personally liable for a debt in excess of a million dollars.

169.   As described above, Pilgrim's Pride used various tactics to force Plaintiffs to capitally improve the farm, to include veiled and unveiled threats of contract removal.  Further, Pilgrims Pride manufactured a list of "complaints" that it used as pretext to cancel the contracts.  These actions were accomplished with the cooperation of Farmers State Bank.

170.   Since said contracts were responsible for servicing the debt on the farm, Plaintiffs have lost their down payment and earnest money, their capital expenditures, the value of their sweat equity, as well as the expectancy damages associated with a long term relationship that was anticipated, as demonstrated by the length of mortgage.

171.   Defendants have been unjustly enriched by these activities to include, but not limited, to the deposits and capital improvements to the farm, as well as the profits produced from the sale of the farm to Plaintiffs, including the services surrounding the sale.

172.   Thusly, a cause of action arises because of these actions by the Defendants[50] and a fact finder may in all likelihood find that the Defendants have

---

[50] Even if money or property is lawfully obtained, an action for money had and received is proper when the money or the proceeds of the sale of the property are retained wrongfully. For instance, if a surplus arises from the sale of a security for a debt, the excess may be recovered by the person

been unjustly enriched at that the Plaintiffs are entitled to at the very least disgorgement of profits and money fraudulently obtained, if not the total reversal of the transaction.[51]  Additionally, the Plaintiffs request any and such other relief, in law and equity, as the Plaintiffs are justly entitled, including the damages described in the Prayer requested below.

## F.  **Constructive Trust**

173.  Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

174.  Additionally, this Court should find a constructive trust regarding the moneys expended by Plaintiffs and stolen by the Defendants in this matter.[52]  As has

---

who is entitled to it in an action for money had and received.  *See Staats v. Miller*, 150 Tex. 581, 243 S.W.2d 686, 687 (1951). An action for restitution based on unjust enrichment or for money had and received may be brought when money is paid by one person in consideration of an act to be done by another and the act is not performed or to recover money paid on a consideration that has failed in whole or in part.  *Barrett v. Ferrell*, 550 S.W.2d 138, 143 (Civ. App.--Tyler 1977, ref. n.r.e.).  For example, if a plaintiff advances a sum of money to the defendant in anticipation of a possible agreement to be made in the future, and the agreement is never made, a cause of action for money had and received will be sustained, provided that the funds were not intended as a gift. *Acoustical Scrs. in Color, Inc. v. T.C. Lordon Co., Inc.*, 524 S.W.2d 346, 350 (Civ. App.--Dallas 1975, ref. n.r.e.). Similarly, a party may sue in an action for money had and received to recover money paid pursuant to an instrument that is void.  *Rayner Cattle Co. v. Bedford*, 44 S.W. 410, 413 (Civ. App. 1898), *aff'd*, 91 Tex. 658, 45 S.W. 554 (1898).

[51] Generally, the amount recoverable in an action on a money count consists of the amount of money improperly transferred or retained.  *Greer v. White Oak State Bank*, 673 S.W.2d 326, 329 (Tex. App.--Texarkana 1984, no writ).

[52]In the instant action, the Plaintiffs have alleged actual fraud, unjust enrichment and an identifiable "res."  *See Sun Life Assur. Co. of Can. v. Dunn*, 134 F. Supp. 2d 827, 2001 U.S. Dist. LEXIS 3012, 26 Employee Benefits Case (BNA) 1603 (S.D. Tex. 2001).  For the court to impose a constructive trust as an equitable remedy, [plaintiff] must prove three elements:

  1. breach of an informal relationship of special trust or confidence arising prior to and apart from the transaction in question, **or actual fraud**;
  2. unjust enrichment of the wrongdoer; and

been previously averred, the Plaintiffs contends that the funds expended in this matter were obtained fraudulently.  As such, equity requires the application of constructive trust for these funds.[53]  These funds should be returned to the Plaintiffs.[54]  In addition, punitive damage is warranted in association with the formation of said trust.[55]

## G.  Breach of Fiduciary Duty

175.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

176.   As stated, the relationship between Plaintiffs and Farmers State Bank was *not* as the result of a an arm length's transaction because of the excessive lender control over, or influence in, the Plaintiffs' business activities.   The relationship between Plaintiffs and Pilgrim's Pride was a fiduciary relationship.  Because Farmers State Bank was Plaintiffs' sole financing choice and because the Bank actively cooperated with/negotiated with Pilgrim's Pride, Plaintiffs reposed great faith, confidence and trust in Farmers State Bank.   Further in interjecting itself into

---

3. an identifiable res.

[53] Equity will impose constructive trust to prevent person who obtains property by fraudulent means from being unjustly enriched. *Thigpen v. Locke*, 363 S.W.2d 247, 250 (Tex. 1962).

[54] *Simmons v. Wilson*, 216 S.W.2d 847, 849 (Tex. Civ. App.--Waco 1949, no writ). "It is a well settled general rule that if one person obtains the legal title to property, not only by fraud, or by violation of confidence of fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who considered in equity as the beneficial owner."

[55] Plaintiff may recover exemplary damages when seeking to impose constructive trust, if pleadings and evidence reveal willful tort. *Seegers v. Spradley*, 522 S.W.2d 951, 957 (Civ. App.--Beaumont 1975, ref. n.r.e.).  Fraud is an intention tort in Texas.

Plaintiffs' affairs, by being physically present in 'inspections' and since the pretextual 'justifications' were either agreed to or to an extent co-authored by the Farmers State Bank, the Bank entered in to a fiduciary relationship with a resulting domination, control or influence exercised by the Bank over the Plaintiffs' affairs.   Said relationship extends far beyond the normal arms-length relationship between a mortgage lending institution and a borrower.   Due to Defendants' breach, the contracts were cancelled and the Plaintiffs were damaged.

## H.  **Breach of the Duty of Good Faith and Fair Dealing**

177.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

178.   Additionally and/or in the alternative, Defendants violated their duty of good faith and fair dealing to Plaintiffs.  As stated, the relationship between Plaintiffs and Farmers State Bank was not a normal creditor-debtor situation.  Rather, a special relationship developed because, among other things, the transaction was not at arm's length and the Bank exerted undue control over Plaintiffs' business affairs. Additionally, regarding Pilgrim's Pride, Pilgrim's Pride is a multi-billion dollar company.  The Plaintiffs constitute a single family running a small business that was not represented by counsel and was not allowed any input into the nature of the contracts.   Additionally, all Defendants in various ways withheld vital material information so as increase the gulf in the bargaining relationship.  As such, there

arose a special relationship of trust and confidence between the parties and an imbalance of bargaining power existed between the parties. Due to Defendants' breach, the contracts were cancelled and the Plaintiffs were damaged.

## I. <u>Conversion</u>

179. Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

180. Plaintiffs hereby sue Defendants for conversion on the basis of Defendants' wrongful exercise of dominion and control over the equipment and property as described below. Defendant Pilgrim's Pride, in concert with Farmers State Bank, converted Plaintiffs' personal property. Said personal property includes, but is not limited too, the equipment and personal property associated with the production of poultry on the farm.

181. Plaintiffs were the owner of said personal property; said property was illegally seized and converted for the use and profit of the Defendants. Defendants unlawfully and without authority assumed dominion and control over Plaintiffs' property and to the extent the property has not yet been returned Plaintiffs hereby demand its return.

182. As a result of such conversion, Plaintiffs have suffered substantial actual damages including, but not limited to, the loss of the income that it could have earned with the converted equipment and property. The conversion of the equipment and

property of Plaintiffs is not only a civil tort, but also constitutes felony theft under the relevant Texas Penal Statutes.   Defendants' conversion of the property, as alleged above, was fraudulent and/or malicious.   Defendants specifically intended to cause substantial injury to Plaintiffs.   As such, punitive damages are proper against Defendants.   Plaintiffs seek actual damages against Defendants far in excess of the jurisdictional limits of this Court, together with punitive damages, pre-judgment and post-judgment interest, and all other relief available under applicable law.

183.   In addition, Plaintiffs hereby seek to recover from Defendants by disgorgement of all revenues and/or profits earned by Defendants in any activities that have utilized, whether direct or indirectly, all or any portion of the converted equipment and property.   Additionally and/or in the alternative, Plaintiffs seek imposition of a constructive trust upon all such revenues and/or profits.

## J.  Tortious Interference with Contract

184.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

185.   In a practical sense, if not legal sense, Pilgrim's Pride interfered with the contracts that it had with Plaintiffs.

186.   Pilgrim's Pride did this because it intended the contracts to fail and had no intention of completing said contracts.   As factually averred above, Farmers State Bank colluded with Pilgrim's Pride in this regard.   As a matter of law in Texas, a

party *cannot* tortiously interfere with its own contract even though, oddly enough, that is what has happened.   Therefore, said interference is not, in and of itself, actionable against Pilgrim's Pride, except to the extent it acts as a part of the pretextual breach and fraud committed against Plaintiffs.

187.   The same, however, cannot be said for Farmers State Bank.   By interfering with the contracts in colluding with Pilgrim's Pride and building a "paper trail" that was used as a pretext to cancel the contracts responsible for servicing the Bank note, the Bank was able to keep the large down payment paid by Hiep Do and/or strip the equity from the farm by rolling the farm over to a new set of 'investors.'   Those contracts were interfered with by Farmers State Bank.   Because of that interference, the contracts were cancelled and the Plaintiffs were damaged.

## K.  Waiver

188.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

189.   Additionally and/or in the alternative, and without waiving any of Plaintiffs' assertions of fraud, conspiracy and pretext supra, Plaintiffs plead that to the extent that Pilgrim's Pride asserts that it was justified in canceling the contracts do to Plaintiffs' performance, Pilgrim's Pride has by its conduct, waived these complaints. Plaintiffs in a continued belief that the relationship would and should continue, continued to make massive repairs and improvements to the Farm.   As a result of this

detrimental change in position, Pilgrim's Pride is estopped[56] from asserting any defense claiming that it was justified in canceling said contracts based on Plaintiffs' performance.

190.   As detailed supra, there is evidence that Plaintiffs ran a superior operation to the prior owners.  For reasons based apparently on greed and patronage, Pilgrim's Pride ignored the previous owner's actions or, rather, lack of action.  Further, even though Pilgrim's Pride did document various minor complaints, Plaintiffs continued to work and corrected the items.  Given that it is apparent now that (1) Plaintiffs were performing in a manner that was superior to what was allowed by prior owners, (2) was allowed to continue working in the manner performed, and (3) that Pilgrim's Pride *contractually renewed Plaintiffs' farm contracts from time to time*, after the alleged violations occurred, Pilgrim's Pride waived its objection.

191.   Further, Pilgrim's Pride alternated back and forth between acting as if it "was serious" about these alleged issues, and alternatively complementing Plaintiffs' performance.   These compliments included extending another contract to Plaintiff

---

[56] A waiver involves an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Hanover Insurance Company of New York v. Hagler*, 532 S.W.2d 136, 138 (Tex. Civ. App. -- Dallas 1975, writ ref'd n.r.e.). Estoppel involves the situation in which the fault or conduct of one party induces the other to change its position for the worse. *Massachusetts Bonding and Insurance Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 401 (Tex. 1967).  *Also See Theriot v. Smith*, 263 S.W.2d 181 (Waco Civ. App., 1953, error dism.) ("equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded from asserting rights against another relying on such conduct; and it arises where a person by his acts, representations, or even silence, induces another to believe that certain facts exist, or is led to change his position for the worse. . .")

Hiep Do months into the alleged "violations" by Plaintiffs.   Because of the "wavering" behavior or "carrot and stick" behavior, Plaintiffs continued to work and continued to invest tens of thousands of dollars in addition to the large sums previously invested.

192.   As such, Defendant Pilgrim's Pride has waived[57] and/or ratified this alleged mismanagement, to the extent it existed and/or therefore is equitably estopped from arguing that it was justified in "taking over of the farm" and terminating the contracts.

## VIII.  Good Faith

193.   Pursuant to Rule 11 of the Federal Rules of Civil Procedure, the Plaintiffs aver that they have in good faith pled the causes of action in this Amended Complaint.   For each and every complaint, averment and legal assertions, the Plaintiffs assert that they have a good faith belief in the applicability of the law to the facts as described or the information and belief described.   Plaintiffs have diligently researched the law and its application to the instant factual circumstance.   To the extent the legal principals discovered are not directly applicable, the Plaintiffs

---

[57] *See Regent International Hotels, Ltd. v. Las Colinas Hotels Corp.*, 704 S.W.2d 101, 1985 Tex. App. LEXIS 12888 (Tex. App. Dallas 1985) (in discussing the sister concepts of waiver which are laches and estoppel, the court stated: "Laches, similar to estoppel, rests on the theory, that because of a delay in the exercise of a legal or equitable right, the defendant would be unconscionably prejudiced if the right were exercised. *Continental Insurance Co. v. Stewart & Stevenson Services*, Inc., 306 S.W.2d 415, 423 (Tex. Civ. App. -- Houston 1957, writ ref'd n.r.e.).  Two essential elements of laches are unreasonable delay by one having legal or equitable rights in asserting them and a good faith change of position by another to his detriment because of the delay., (citing *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964)).

incorporate all arguments above and hereby argue for the extension, modification, or reversal of existing law.  Either based on actual knowledge, documented fact or as identified "on information and belief," the allegations and other factual contentions have evidentiary support or are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## IX.  Suit for an Accounting

194.   Plaintiffs incorporate by reference all allegations and argument in this Amended Complaint.

195.   Given the numerous misrepresentations, breaches of contract, breaches of fiduciary duty, self-dealing, fraud, and misuse of Plaintiffs' funds and assets, the apparent conversion of Plaintiffs' property (to include the physical removal of some of Plaintiffs' chattels from Timberlake Farm) and the grossly suspicious valuation of the farm (all of which resulted in hundreds of thousands of dollars of profit for David Van Hoose and the Truongs in spite of owning the farm for approximately one year), Plaintiffs, as a separate cause of action and/or in the alternative, request this Court to order a complete accounting of Pilgrim's Pride, Farmers State Bank, Brimhall Appraisal Services, Professional Title Services, Alexander Hungngoc Nguyenlien, Louis Truong a.k.a. Luan Truong, Truong Truong, Adam Truong, Alan Truong, and other unnamed Truong Family Members (collectively "the Truongs").

196.   Specifically, Plaintiffs seeks an accounting of all business activities related to Timberlake Farm, all income, appraisals, title documents, and expenses since the time of sale of Timberlake Farm to David Van Hoose to Mr. Alexander Nguyenlien to Plaintiffs.  Plaintiffs requests the Court order Defendants to turn over all financial and accounting records, including valuations, concerning the Timberlake Farm and contracts to raise poultry on said farm over this period.  Plaintiffs request that Defendants be ordered to turn this information over to their counsel so that a true valuation and state of their accounts can be established.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Hiep Do and Julie Do pray the Defendants be cited to appear and answer, and that upon notice and final hearing of this cause that Plaintiffs have judgment as follows:

(1)   Grant judgment against Defendants, jointly and severally, for actual damages.  Actual damages include, but are not limited to, damages for breach of contract (direct, consequential and/or reliance), loss of investment, payment of interest on farm loan, and lost profits regarding the contracts on the farm over a reasonable period as well as other income sources that would have been derived from the farm over the same period;

(2)     Grant judgment against Defendants, jointly and severally,

for other damages pled, including lost profits that can not be

calculated until after adequate discovery has been allowed;

(3)     Grant judgment against Defendants, jointly and severally,

for punitive and exemplary damages.   As reflected by the

factual allegations herein, which are incorporated by reference

for all purposes, Defendants have conducted themselves in a

manner, which underlies their blatant disregard for their

contractual and ethical obligations, the rights of persons who

form businesses, and the applicable state and/or federal laws.

An innocent mistake or misstatement may happen once, but

here there were many opportunities to rectify such matters

prior to causing Plaintiffs such devastating economic damage.

When such conduct occurs, it is conscious indifference and

reckless disregard by such individuals for the interests of

themselves or others.   Opportunistic members of the business

community must be reminded that persons with stronger

positions of knowledge are in fact stronger positions of power,

which carry great responsibility and are not a license to act as

Defendants have acted.   Plaintiffs respectfully submit that

Defendants should be assessed exemplary and punitive damages in an amount at least four (4) times Plaintiffs' actual damages, so as to confirm society's unwillingness to tolerate the kind of conduct Defendants are guilty of and to serve as an example to others;

(4)     Grant judgment against Defendants for all reasonable and necessary attorneys' fees, expert fees, and all costs incurred through trial and for all appeals of this case as provided by law;

(5)     Award Plaintiffs pre-judgment and post-judgment interest at the maximum legal rate;

(6)     Grant equitable relief, including rescission, injunctive relief as permitted at law or in equity, receivership, attachment, impounding, imposition of a constructive trust upon, or otherwise restricting or voiding transfer of Defendants' assets so as to assure that Plaintiffs have an effective remedy;

(7)     Require an accounting of all the business conducted by Pilgrim's Pride, Farmers State Bank, Brimhall Appraisal Services, Professional Title Services, Alexander Hungngoc Nguyenlien, Louis Truong a.k.a. Luan Truong, Truong Truong, Adam Truong, Alan Truong, and other unnamed Truong Family Members

(collectively "the Truongs").   Specifically, Plaintiffs seeks an accounting of all business activities related to Timberlake Farm, all income, appraisals, title documents, audit or correction letters, and expenses since the time of sale of Timberlake Farm to David Van Hoose to Mr. Alexander Nguyenlien to Plaintiffs.   Plaintiffs requests the Court order Defendants to turn over all financial and accounting records, including valuations, concerning the Timberlake Farm and contracts to raise poultry on said farm over this period.   Plaintiffs request that Defendants be ordered to turn this information over to their counsel so that a true valuation and state of their accounts can be established;

(8)    That Defendants be ordered to restore or amend Plaintiffs' credit history with all major credit reporting agencies, including, but not limited to, reporting their credit history as it would have been but for the purchase and financing of Timberlake Farm. Defendants also be required to submit letters, affidavits and/or any other form documentation to effectuate this the remedy.

(9)    That all disputed matters be submitted to the jury for trial; and

(10)   Grant Plaintiffs all other and further relief, either at law or in equity, general and specific, to which they may be justly entitled.

Respectfully submitted,

O'QUINN, LAMINACK & PIRTLE

/s/ Stephen R. Walker
Charles E. Soechting
State Bar No. 18821300
Stephen R. Walker
State Bar No. 24034729
440 Louisiana, Suite 2300
Houston, Texas 77002
Tel (713) 223-1000
Fax (713) 223-0937

LOCAL COUNSEL

LAW OFFICE OF WAYNE D. HAGLUND, P.C.

WAYNE D. HAGLUND
State Bar No. 08697500
P.O. Box 713
Lufkin, Texas 75902
Tel (936) 639-0007
Fax (936) 639-0016

**ATTORNEYS FOR PLAINTIFFS
HIEP DO AND JULIE DO**